# <u>Exhibit 1</u>

The Secretary's Plan for
One Interconnected Statewide
Voter Registration Database,
including
Exhibits A through H

# A PLAN FOR ONE INTERCONNECTED STATEWIDE VOTER REGISTRATION DATABASE



**The State of Alabama's Proposed Plan for the Establishment and Implementation of a Statewide Voter Registration System that is Compliant with the Help America Vote Act of 2002**

**Submitted June 29, 2006**

Contact:
Office of the Secretary of State of Alabama
Alabama State Capitol
600 Dexter Avenue, Suite S-105
Montgomery, Alabama 36130
(334) 242-7205 phone

1

# TABLE OF CONTENTS

| SECTION | TOPIC | PAGE |
|---|---|---|
| 1.0 | BACKGROUND AND INTRODUCTION | 1-8 |
| 2.0 | PLAN REQUIREMENTS AND OBJECTIVES | 8-12 |
| 3.0 | RESPONSES TO PLAN REQUIREMENTS | 12-36 |
| Exhibit A | Original RFP | 37 |
| Exhibit B | List of County Systems | 38 |
| Exhibit C | Revised Voter Registration Forms | 39 |
| Exhibit D | April, 2006 Memorandum to Registrars | 40 |
| Exhibit E | SSA and DPS Documents | 41 |
| Exhibit F | Letters from Public Health and AOC | 42 |
| Exhibit G | Letters from Election Officials re: Plan | 43 |
| Exhibit H | Estimated Plan Timeline | 44 |

## 1.0 BACKGROUND AND INTRODUCTION

On May 30, 2006, the United States District Court for the Middle District of Alabama ordered that the Secretary of State, as Alabama's Chief Election Official, draft and submit a proposed plan by noon, June 29, 2006 for achieving compliance with Sections 303(a) and (b) of the Help America Vote Act of 2002 (HAVA, 42 U.S.C. §§ 15483(a), (b).

The Order was entered after a compromise was achieved between the State of Alabama and the United States Department of Justice. The compromise permitted the Secretary of State to submit a HAVA voter registration compliance plan to the Court.

In accordance with the Court's Order, this Plan is submitted to the United States District Court for the Middle District of Alabama and the Voting Section of the Civil Rights Division of the United States Department of Justice by Nancy L. Worley, in her official capacity as Secretary of State of Alabama, through the Honorable Troy R. King, Attorney General of Alabama. This Plan represents an attempt to successfully resolve this litigation and ensure that Alabama develops a uniform, statewide voter registration database that is fully compliant with the Help America Vote Act of 2002 ("HAVA").

This Plan will be implemented by the Office of the Alabama Secretary of State, in cooperation with appropriate State and local officials, and funded by the Alabama Help America Vote Fund (federal HAVA funds), except where explicitly stated otherwise. This Plan will apply

only to federal elections, although the Secretary of State reserves the authority to prescribe by rule any or all of its provisions for other elections.

## 1.1 Alabama's Progress in Implementing Key HAVA Mandates

Although Alabama, like many states, is not yet fully compliant with HAVA, the State has implemented a number of its key provisions. The following are some examples of Alabama's progress toward full HAVA compliance.

- The Alabama Legislature adopted HAVA enabling legislation in 2003, and an election was held later that year where the new voter identification requirements were implemented.
- The once-independent Office of Voter Registration was placed under the umbrella of the Secretary of State's office in 2003.
- Alabama replaced all of its remaining lever voting machines.
- All 67 Alabama counties selected and purchased HAVA-compliant voting equipment, including optical scan voting machines with a voter verifiable paper audit trail and machines designed to allow people with disabilities to vote without assistance.
- Alabama conducted an extensive voter file maintenance process, where a postcard was mailed to every voter in Alabama to verify that each voter's record is current. Numerous voter records in the suspense file were purged.

- The Secretary of State's office conducted training sessions for election officials statewide before the 2004 elections in order to help them implement the new, federally-mandated provisional ballot procedure.

- The Secretary of State's office issued the first Alabama Voter Guide in Braille and provided magnifying sheets to every polling place in Alabama for voters with low vision.

- The Secretary of State's office conducted a voter education project in 2004, using public service announcements to inform voters of voting changes, such as voter ID and provisional voting. The project is being repeated in 2006.

- Alabama clearly defined what constitutes a vote on its voting equipment. The new rule defining a vote has been submitted to the Department of Justice for review pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c ("preclearance").

- The Secretary of State established a HAVA complaint procedure by administrative rule.

**1.2 The Challenges of a New Statewide Voter Registration System**

The State of Alabama has experienced a number of hurdles to implementing a new statewide voter registration system, including a suspension of contract negotiations, inadequate funding, and reluctance by some State and county officials to support the change to a new statewide system.

### 1.2.1 The RFP Process

The Secretary of State's office issued a Request for Proposals ("RFP") on August 12, 2003 that was delivered to approximately 60 vendors, who had responded to an earlier letter that was sent out to approximately 600 vendors. Approximately twelve vendors responded to the RFP, but two vendors later withdrew their proposals from consideration.

The Secretary of State assembled a group of technology experts from the business, education, and government sectors to evaluate the vendors that submitted proposals. The group assigned numerical ratings to the proposals which narrowed the selection down to five vendors.

The Secretary also solicited input from Alabama's HAVA Committee, the Voter Registration Advisory Board, and three separate groups composed of Registrars, Probate Judges and Circuit Clerks. The Alabama HAVA Committee deliberated for approximately a year and issued its final recommendations to the Secretary of State. These groups came to conflicting recommendations.

After consideration of the recommendations and assessing each of the proposals for cost effectiveness and HAVA compliance, the Secretary of State announced that Alabama would enter into negotiations with Diebold to design and implement a new, HAVA-compliant statewide voter registration database.

Negotiations with Diebold were later suspended when it became clear that Diebold would only permit the State to license, but not own, the database software. Therefore, on August 18, 2005, the Secretary of State issued an amendment to the original RFP which included revised language allowing for a software licensing arrangement with the selected vendor. The original RFP and the amendment are attached as **Exhibit A.**

Three vendors submitted amended proposals on or about September 1, 2005: (1) EDS/Syscon, (2) Elections Systems and Software/Unisys (ES&S), and (3) Diebold. Each responding vendor agreed to a licensing arrangement and submitted revised prices, two of which were less than the original responses.

### 1.2.2 Shortage of Funds

The Secretary of State had a status meeting with the three vendors on September 30, 2005. The Secretary of State stated to representatives from each of the three companies that Alabama could not enter into a software licensing agreement until funding for the continuing operation and maintenance of the system was added to the State budget.

Alabama received one-time funding for election reform from the federal government as part of HAVA, but Congress did not provide enough dollars or recurring dollars to cover the annual cost of running and maintaining Alabama's statewide voter registration database. In its 2007 State budget request, the Secretary of State's office asked the Governor and the Legislature for a commitment of approximately

$400,000 in additional funding to defray recurring, year-to-year licensing and data line costs associated with the system. The request was not approved.

### 1.2.3 Resistance from Some State and County Officials

The implementation of a new voter registration database has also been delayed due to resistance from some State and county officials. Currently, approximately 30 counties maintain their own databases, separate from the State's list of registered voters. One of the State's largest counties strongly promoted a bill in the Legislature in April of 2006 that would have allowed the counties to keep their separate systems. At the insistence of the Secretary of State and some committee Legislators that this multi-system approach would promote the lack of a uniform voter list and would promote voter fraud, the bill was defeated.

However, many counties continue to maintain their own separate voter databases. A list of the counties and their voter registration systems is attached as Exhibit B.

### 2.0 PLAN REQUIREMENTS AND OBJECTIVES

The following section includes the responses to the Plan requirements and objectives as listed on pages nine through eleven of the Memorandum and Order ("Preliminary Injunction") issued by the United States District Court for the Middle District of Alabama.

## 2.1 General Objectives

The short-term general objective of this Plan, as required by the Court's Order, is to bring the Alabama Voter Information Network ("ALVIN"), Alabama's current statewide voter registration system, into the greatest possible degree of compliance with HAVA by November 7, 2006, the date of the 2006 General Election.

In order to fulfill the short-term general objective, Registrars who currently enter data directly and exclusively into ALVIN will be required to continue to do so, while Registrars who currently enter data into ALVIN via local voter registration systems will be required to transmit new voter registration data to ALVIN every business day. Registrars who operate on a "dual entry" basis, entering data directly to ALVIN and their county systems, will be required to enter data into both systems concurrently. Further, there will be a moratorium on the implementation of any new local voter registration systems to prevent counties from purchasing local voter registration systems that may not be compatible with the new statewide system and new regulations.

The long-term general objective of this Plan is to bring Alabama's statewide voter registration system into full compliance with HAVA for all federal elections starting with the first federal election of 2008. The long-term general objective will be achieved utilizing a new statewide voter registration system developed and initially implemented by a contractor, chosen after a deliberative purchasing process. During the

9

first federal election in which the new system is used, ALVIN will remain online as a back-up mechanism.

For the long-term objective, the Secretary of State's office will exercise its rulemaking authority in such a way as to effectively prohibit the use of all local voter registration systems to conduct federal elections in the State of Alabama. This action is necessary to fully implement HAVA and guard against duplicate and illegal voter registration.

## 2.2 Rulemaking Plan

Under Alabama law, the Secretary of State has broad rulemaking authority to implement HAVA. <u>Code of Ala. 1975</u>, § 17-1-8 (stating that the Secretary of State is the State's "chief elections official" and granting the Secretary of State "rule making authority for the implementation of Act 2003-313 [HAVA's enabling legislation] under the Alabama Administrative Procedure Act"). With the Court action pending, the Secretary of State will exercise that authority to ensure timely and complete implementation of this Plan.

All administrative rules described in this Plan will be promulgated in compliance with the Alabama Administrative Procedures Act, <u>Code of Ala. 1975</u>, § 41-22-1 *et seq.* The Secretary of State will inform local election officials in advance of any public hearings held on proposed administrative rules filed with Legislative Reference Service to implement this Plan.

Any rules promulgated by the Secretary of State may need to be enforced by State or federal court order.

Under Alabama law, any non-emergency administrative rulemaking takes at least 70 days to complete.  Prior to making a new rule, the Secretary of State must afford interested parties at least 35 days notice. Notice is given by publication in the <u>Alabama Administrative Monthly,</u> the date of which constitutes the date of notice.  <u>Ala. Code 1975</u>, § 41-22-5(a)(1).  After the 35-day period is complete, the Secretary of State must afford interested parties an opportunity to submit written and oral comments.  <u>Ala. Code 1975</u>, § 41-22-5(a)(2).  Then, after comments are reviewed and necessary revisions are made, 35 additional days will pass before a rule is adopted.  During this second 35-day period, the Joint Legislative Committee on Administrative Regulation Review may approve or disapprove of the rule.  If the Committee takes no action on the rule within the 35-day timeframe, the rule is deemed approved and is added to the <u>Alabama Administrative Code</u>.  <u>Ala. Code 1975</u>, § 41-22-23(b).

In the event of an emergency endangering the "public health, safety, or welfare," an emergency rule may be filed with Legislative Reference Service and deemed effective immediately.  However, an emergency rule may not last for more than 120 days.  <u>Ala. Code 1975</u>, § 41-22-5(b).

Given the time constraints applicable to this Plan, permanent rules may need to be filed concurrently with corresponding emergency rules. However, even an emergency rule will be delayed due to the 60-day

period the Department of Justice has to conduct a review pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c ("preclearance").

## 3.0 RESPONSES TO PLAN REQUIREMENTS

The following are the responses to the specific requirements and objectives for the State's Revised HAVA Compliance Plan, as defined on pages nine through eleven of the Court's Memorandum and Order ("Preliminary Injunction"). Any change to any practice or procedure affecting voting within this Plan will be submitted to the Department of Justice for review pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c ("preclearance"). By statute, the Department of Justice has up to 60 days to conduct such a review.

3.1 <u>The immediate revision of voter registration applications to comply with all HAVA requirements.</u> Preliminary Injunction at p. 9.

3.1.1 Alabama's voter registration applications have been revised to comply with all HAVA requirements and have been submitted to the Department of Justice ("DOJ") for review pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c ("preclearance"). The Attorney

General of Alabama, in cooperation with the Secretary of State, mailed the revised applications to DOJ on June 2, 2006, and DOJ received the submission on June 5, 2006. Therefore, the Secretary of State anticipates a response from DOJ by August 4, 2006.

3.1.2 Upon review by DOJ pursuant to Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c ("preclearance"), the revised applications will be printed and distributed to Registrars and agencies covered by the National Voter Registration Act of 1993 ("NVRA").[1]

The revised applications will be printed by the Alabama Department of Corrections, a contractor holding a pre-existing State contract, or another contractor offering a lower cost alternative. However, such a large print job (200,000+) will take some time to complete, perhaps up to eight weeks.

---

[1] The NVRA requires that individuals have the opportunity to vote at the same time they receive or renew a driver's license. The NVRA also requires that public assistance agencies provide voter registration assistance to their clients. See 42 U.S.C. § 1973gg *et seq.*

The revised applications will be distributed to Registrars and NVRA agencies and will also be made available at the Secretary of State's office and on the Secretary of State's website.

3.1.3 Upon distribution of the revised applications, Registrars and agencies covered by NVRA will be instructed to discard all previous voter registration applications and begin using the new applications immediately.

3.1.4 Attached as <u>Exhibit C</u> are the two revised voter registration applications, which contain the following relevant, HAVA-mandated changes:

- A question which advises an applicant for voter registration that it is required that he or she provide a current and valid driver's license number, or the last four digits of the applicant's Social Security number if the applicant does not possess a current and valid driver's license.    42 U.S.C. § 15483(a)(5)(A)(i)(I) and (II).

- A question regarding whether an applicant will be 18 years-of-age by Election Day that prompts the applicant to

14

indicate a yes or no answer by checking the appropriate box; and a statement that instructs the applicant not to complete the application if he or she has answered no to this question.  42 U.S.C. § 15483(b)(4)(ii) and (iii).

- A revised citizenship question, asking the applicant to indicate a yes or no answer by checking the appropriate box, and a statement that instructs the applicant not to complete the application if he or she has answered no to this question.  42 U.S.C. §15483(b)(4)(i) and (iii).

- Specific instructions for first-time registrants by mail concerning HAVA's identification requirements.  42 U.S.C. § 15483(b)(4)(iv).

**3.2** <u>An interim plan to bring the State's existing voter registration system (ALVIN) into the greatest possible degree of compliance with the requirements of HAVA by the November 2006 elections for Federal office.</u>  Preliminary Injunction at p. 9.

**3.2.1** The Secretary of State will develop numeric codes to identify driver's license numbers and partial Social Security numbers in ALVIN

for new registrants. This change will coincide with the distribution of the revised voter registration applications described above. The Secretary of State will send a memorandum to all Registrars notifying them of the appropriate codes. The codes will be designed to ensure that users of ALVIN can differentiate between prior registrants identified by their Social Security numbers and new registrants identified by either their driver's license numbers or partial Social Security numbers.

3.2.2 Counties who currently operate local voter registration systems will be permitted to continue to do so during the November 2006 General Election. Such counties who currently print poll lists from local voter registration systems will be permitted to continue to do so during the November 2006 General Election. All Registrars currently entering data directly into ALVIN will be required to continue that practice, and a moratorium will be issued against the implementation of any additional local voter registration systems.

**3.2.3** Starting with the first federal election of 2008, local election officials will be required by rule to conduct federal elections using only the official statewide voter registration system.

**3.2.4** Any county operating a local voter registration system whose Registrars do not currently enter data directly into ALVIN will be required to transmit any new voter registration data electronically to ALVIN at least once every business day.

**3.2.5** Any Registrar who transmits voter registration data to ALVIN will be required to certify to the Secretary of State that such data is complete when entered, consistent with the data stored in the local voter registration system, and in the format required by the Secretary of State. The certification will be required to take the form of an affidavit to be mailed to the Secretary of State every two weeks. The language of the form affidavit will acknowledge that Registrars must often rely on the applicant to provide accurate information.

3.2.6 Any county operating on a "dual entry" basis, entering data directly into ALVIN and a county system, will be required to enter any new voter registration data into both systems concurrently.

3.2.7 The Secretary of State will run monthly checks on the data contained in ALVIN to confirm that data is transmitted to ALVIN in a timely and correct manner. The Secretary of State will require that counties provide the State reasonable access to their local voter registration systems to confirm that the data in ALVIN matches that of the local systems.

3.2.8 These requirements formalize and supplement a written directive to the Registrars issued by the Secretary of State on or about April 21, 2006 that each county operating an independent voter registration system transmit its new voter registration data to ALVIN at least once every 24 hours. This policy went into effect on May 1, 2006. Please find attached as **Exhibit D** a copy of the relevant memorandum to Registrars.

**3.2.9 Any administrative rule necessary to implement this portion of the Plan will be filed with Legislative Reference Service within four weeks of the Plan being accepted by the Court.**

**3.2.10 The preceding portion of this Plan represents the greatest degree of HAVA compliance reasonably possible for ALVIN for the November 2006 General Election.   To attempt to make any other changes to ALVIN in such a compressed timeframe would be to risk the smooth conduct of the November 2006 General Election; as there is insufficient time to train election officials in counties which do not currently use ALVIN and there is insufficient time to establish the necessary data lines.**

*\*With the exception of Section 3.9.1, the remainder of this Plan applies to the new, HAVA-compliant, computerized statewide voter registration list for the conduct of all federal elections starting with the first federal election of 2008.[2]*

---

[2] In 2007, the only elections scheduled to be held are for municipal governments.

**3.3 The use of a competitive procurement process (Request for Proposal or RFP) to select a bidder who will be awarded a contract to implement a new, HAVA-compliant, computerized statewide voter registration list as the official list for the conduct of elections for federal office. The winning bidder will be responsible for all technical tasks associated with this project. The Permanent System RFP will not specify a technical solution to the competing bidders. Instead, it will describe the business outcomes and functional requirements of the system, along with overall State goals, such as rapid development and implementation, expedited completion, and minimization of disruption.** Preliminary Injunction at pp. 9-10.

3.3.1 Within two weeks of the Plan being accepted by the Court, the Secretary of State will mail a letter to members of the relevant professional community listed with the Division of Purchasing of the Department of Finance requesting that vendors interested in developing a new statewide voter registration database respond in writing within two weeks. The Secretary of State mailed a similar letter to approximately 600 vendors prior to the original Request for Proposals ("RFP").

**3.3.2** No later than six weeks after the Plan is accepted by the Court, the Secretary of State will issue a RFP to those vendors to purchase the services of a contractor to provide Alabama's long-term HAVA voter registration list solution. The original RFP will serve as the basis for the new RFP. However, the new RFP will incorporate any requirements set out herein or otherwise required by the Court. The RFP will comply with Alabama purchasing law and procedure. Consistent with the original RFP, the vendors will have approximately 45 days to respond to the RFP.[3]

**3.3.3** The Secretary of State, in conjunction with appropriate technology experts from the business, government, and education sectors, will evaluate the submitted proposals and determine which are responsive to the RFP. The Secretary of State will then examine the proposals to determine a slate of five finalists (assuming more than five proposals are submitted). This process will be completed in six weeks or less.

**3.3.4** The five proposals of the finalists will then be submitted to the Chairman of the Voter Registration Advisory Board ("Board"), the

---

[3] 45 days seemed to be an adequate timeframe for the vendors to respond to the original RFP.

President of the Alabama Probate Judges' Association ("Probate Judges' Association"), the Chairman of the HAVA Committee ("Committee"), and the President of the Alabama Association of Boards of Registrars ("Registrars' Association") for input and advice. The Board, the Probate Judges' Association, the Registrars' Association, and the Committee will have no more than two weeks to offer comments. The chairs of the respective entities will be responsible for calling any meetings to discuss the proposals.

3.3.5 The Secretary of State will select a vendor after she considers input offered by the Board, the two associations, and the Committee. Once she has selected a vendor, the State will enter into contract negotiations with the chosen vendor. The Secretary of State will spend no more than 30 days making the selection.

3.3.6 The contract will largely mirror the new RFP and will incorporate any relevant order(s) from the Court and all relevant State and federal law. Technical details will be left to the selected vendor. The contract will allow a maximum of nine months for project completion.

**3.3.7** Once the contract is drafted and executed, the Secretary of State will submit the contract to the Permanent Joint Legislative Contract Review Oversight Committee ("Contract Review Committee"), in accordance with Ala. Code 1975, § 29-2-41.[4]  The Contract Review Committee typically meets no more than once a month and the Committee has the authority to delay any service contract for up to 45 days.

**3.3.8** The Secretary of State will procure, with advice from the selected vendor, all necessary hardware to accompany the new statewide voter registration system.  To the extent possible, the necessary hardware will be purchased from the State's bid list, which is maintained by the Division of Purchasing of the Department of Finance.  Any additional hardware will be purchased via the issuance of Invitations to Bid ("ITB") in compliance with State purchasing requirements.

Anticipated hardware needs include a desktop computer for each Registrar, each Probate Judge, and each Circuit Clerk (approximately

---

[4] The Secretary of State anticipates that a contract will take approximately 90 days to negotiate, draft, and execute.  However, the time required to complete a contract will be largely dependant on the vendor.

23

333 desktop computers); a printer for each Registrar office; and at least two servers (one server will serve as a back-up). Once a contract has been executed between the State and its selected vendor, the Secretary of State will issue an ITB with appropriate technical specifications to purchase the servers, unless suitable servers are then available from the State's bid list. In cooperation with other State officials, the Secretary of State will need to make arrangements for the necessary servers to be housed in secure and separate locations.

3.4 <u>The implementation by the Secretary of State of regulations, procedures, and technical systems to verify that all data contained in the statewide voter database is valid and in the proper format.</u> Preliminary Injunction at p. 10.

3.4.1 The selected vendor will be required to develop a system which will reject data entered contrary to an established format, notify users of the correct format, and allow the properly formatted data to be entered. This requirement will be set out in the RFP. The proper format will be developed in cooperation with the selected vendor and communicated to all Registrars.

24

**3.4.2** The selected vendor will be requested to develop a system which will allow voters to examine their voter registration information on the Internet.  This will allow voters to confirm their registration status to help ensure the accuracy of the voter registration list.  No sensitive information, such as Social Security numbers or birthdates, will be made available on the Internet.

**3.4.3** Registrars will be required to periodically sign affidavits which will attest to the validity and accuracy of information entered into the new statewide voter registration database.  The language of the form affidavit will acknowledge that Registrars must often rely on the applicant to provide accurate information.  This requirement will be incorporated into an administrative rule with appropriate enforcement mechanisms.

**3.5** The establishment by the Secretary of State of procedures and technical processes to record in the statewide voter database information regarding list maintenance activities, voter identification, and voter verification requirements, and any other additional data

25

<u>elements required by HAVA and other relevant law.</u>  **Preliminary Injunction at p. 10.**

**3.5.1 The selected vendor will be required to develop a guide (preferably electronic) that may be accessed by users of the voter registration database and will provide guidance on issues related to maintenance activities, voter identification, and voter verification.  The guide will be updated on an annual basis and will supplement additional training provided by the Secretary of State on the use of the new system.  This requirement will be set out in the RFP and incorporated into the contract.**

**3.6  <u>The enforcement of the statewide data format and content standards.</u>  Preliminary Injunction at p. 10.**

**3.6.1 As set out in Section 3.4.1, this issue will be covered by software developed under the RFP.  The software will be self-enforcing as to format and content standards.**

**3.6.2** The Secretary of State will provide annual regional training sessions on format and content standards and other issues related to the new, statewide database. The Secretary of State will also provide each Registrar with a training manual for the new system, the technical aspects of which will be drafted by the selected vendor in accordance with the RFP and the vendor contract.

**3.7** <u>The promulgation of State regulations necessary to enforce the voter registration requirements of HAVA, including the voter identification requirements of Section 303(b) and the voter verification requirements of Section 303(a)(5)</u>. Preliminary Injunction at p. 10.

**3.7.1** The State of Alabama has a universal voter identification requirement. <u>Code of Ala. 1975</u>, § 17-11A-1.

In 2003, the Alabama Legislature passed two bills relating to voter identification. The first bill, Act Number 2003-313, passed on June 19, 2003, adopted the voter identification requirements of HAVA, generally mandating that any voter who fails to present identification at the time of registration must do so prior to voting. However, five days later, Act

Number 2003-381 was passed, codified as <u>Code of Ala.</u> 1975, § 17-11A-1, requiring that "each elector" provide identification prior to voting. As such, Alabama law provides for more stringent voter identification than HAVA.

Due to this universal identification requirement, Alabama has no need for the complex regulations necessary in other states to enforce the voter identification requirements of HAVA. However, the selected vendor will be required to provide an automated system for keeping track of registered voters who provide identification at the time of registration. This requirement will be set out in the RFP and incorporated into the contract.

3.8 <u>The verification and, as necessary, the update of regulations concerning list maintenance activities as required by HAVA; the monitoring and confirmation that registrars and counties are uploading the required list maintenance information to the statewide voter registration database; and the development of appropriate enforcement procedures against registrars and counties not in compliance, including but not limited to investigation regarding the need for training,</u>

<u>development, and deployment of technological and procedural</u>

<u>solutions, as necessary, and taking punitive action, including litigation.</u>

Preliminary Injunction at p. 10.

3.8.1 The Secretary of State will promulgate administrative rules to ensure that the new system is a uniform, statewide voter registration database. With respect to federal elections, the proposed rules will:

- Specifically define the official statewide voter registration list;

- Require Registrars to enter voter registration data into only the official statewide database;

- Require that all federal elections be conducted from poll lists produced directly and exclusively from the official statewide database;

- Require Registrars to attend training sessions, review training materials, and achieve certification by the Secretary of State to use the official statewide voter registration system; and

- Require that each Registrar and his or her appointing official certify that the Registrar meets the minimum

29

qualifications of the office.  For the appointing official, the appointment letter to the Secretary of State will constitute the required certification.  Under <u>Ala. Code 1975</u>, § 17-4-150, Registrars must be qualified electors, residents of the county in which they serve, have a high school diploma or its equivalent, and possess the minimum map reading and computer skills necessary to function in the office.

The administrative rules will be enforceable and provide for specific consequences for noncompliance, including removal from office for noncompliant Registrars, in the event that lesser enforcement mechanisms are ineffective.  <u>Code of Ala. 1975</u>, § 17-4-151 (stating that "registrars... may be removed for cause by the Secretary of State...").  Such rules will be enforced in compliance with applicable law.

3.8.2 Additionally, a rule will be promulgated barring certificates of election from being issued to candidates elected in federal elections conducted with poll lists produced from local voter registration systems.  The rule will further define the standard of proof and the procedure necessary for such action.

The Secretary of State issues certificates of election to federal legislative candidates.  Ala. Code 1975, § 17-14-24.

The proposed rule, promulgated under the rulemaking authority granted to the Secretary of State under Code of Ala. 1975, § 17-1-8, would enforce the law of Alabama that the statewide list "shall serve as the official voter registration list for the conduct of all elections."  Ala. Code 1975, § 17-4-210(a)(9).  This will be appropriate once the new system is in place, as there will be no special circumstances compelling the use of an alternative arrangement.

3.9 The development of network connections to obtain data from other State agencies to identify ineligible registrations *for both the interim enhanced system and the permanent fully HAVA-compliant system,* including but not limited to enhanced interfaces with the Alabama Administrative Office of Courts, the Alabama Department of Public Health, and the Alabama Department of Public Safety, and through the latter, an enhanced interface to the Social Security Administration. Preliminary Injunction at p. 10.  (emphasis added).

31

**3.9.1  The Secretary of State, in cooperation with the Information Services Division of the Department of Finance ("ISD"), will attempt to develop enhanced interfaces between ALVIN and the Administrative Office of Courts ("AOC"), the Department of Public Health, the Department of Public Safety ("DPS"), and, through the latter, the Social Security Administration ("SSA").**

**While the Secretary of State submits this portion of the Plan in a good faith effort to respond to the Court's directives, the Court should be aware that the goal of connecting ALVIN to other State agencies and SSA by the November 2006 General Election may not be achievable.  It is not known whether such interconnections are possible at all, much less possible by the November 2006 General Election.  Further, a hasty attempt to put those connections in place may prove damaging to the smooth operation of the November 2006 General Election.  It is noted that a successful Primary Election was recently held on June 6, 2006, using a combination of ALVIN as currently constituted and local voter registration systems.**

32

- The Secretary of State will attempt to develop an interface between SSA and DPS. An agreement to facilitate this interface has been drafted and signed by DPS. However, as of June 28, 2006, SSA has not signed the agreement. Please find attached as <u>Exhibit E</u> a copy of this unexecuted agreement and an accompanying document. DPS will be separately reporting its progress in negotiations with SSA.

- Next, the Secretary of State will attempt to develop an interface between DPS and ALVIN. The necessary interagency agreement will provide the legal framework for the connection.

- The Secretary of State will attempt to develop similar interfaces between ALVIN and the Administrative Office of Courts ("AOC") and the Department of Public Health. Please find attached as <u>Exhibit F</u> recent letters from the Department of Public Health and AOC.

**3.9.2 HAVA-compliant interfaces will also be developed for the new, HAVA-compliant, computerized statewide voter registration list.**

- **The selected vendor will be responsible for the technical implementation of the above-referenced interfaces. The selected vendor will communicate directly with the relevant agencies to cooperatively develop the interfaces. These responsibilities will be set out in the RFP and incorporated into the contract.**

- **The Secretary of State will prepare any necessary interagency agreements in accordance with the timeline set out in the RFP and the vendor contract.**

- **To the extent possible, the selected vendor will utilize any pre-existing interfaces developed for ALVIN. This responsibility will be set out in the RFP and incorporated into the contract.**

**3.10 The update of the Secretary of State's website as appropriate and the issuance of press releases pertaining to any progress or delays concerning implementation of HAVA.** Preliminary Injunction at p. 11.

3.10.1 The Secretary of State will continue to update the public as to developments related to HAVA, using press releases, Internet postings, and other necessary means to communicate with the public. The Secretary of State's website is equipped with a "HAVA button," which contains most of the major public documents related to the implementation of HAVA in Alabama. A copy of this Plan has been posted on the website, and a copy of the draft Plan was posted on June 23, 2006. Written comments from local election officials on the draft Plan received by the Secretary of State as of June 28, 2006 are attached as Exhibit G.

3.10.2 The Secretary of State will also continue to communicate developments in implementing HAVA to local election officials throughout the State. This communication will be primarily in the form of mailed or faxed memoranda to local election officials.

**3.11  The  assignment  of  unique  identification  numbers  and  the
elimination  of  duplicate  voter  registration  records.**    Preliminary
Injunction at p. 11.

**3.11.1  The  new  voter  registration  system  will  be  required  to
automatically  assign  unique  identification  numbers  to  voters.    This
requirement  will  be  set  out  in  the  RFP  and  incorporated  into  the
contract.**

**3.11.2 The new system will be required to identify duplicate records and
automatically  notify  the  appropriate  Registrar(s)  of  such  duplicates  for
appropriate  action.    This  requirement  will  be  set  out  in  the  RFP  and
incorporated into the contract.**

**Approximately  98%  of  Alabama's  registered  voters  are  currently
identified  by  their  unique  Social  Security  numbers.    The  remaining
voters  are  assigned  randomly  generated  unique  numbers.    Further,
ALVIN  runs  weekly  reports  to  detect  duplicate  records,  with  the
resulting  data  forwarded  to  the  appropriate  Registrar(s)  for  any
necessary action. END OF PLAN.**

# EXHIBIT

# A

# REQUEST FOR PROPOSALS

## FOR A

## VOTER REGISTRATION SYSTEM



## ISSUED BY

## STATE OF ALABAMA
## SECRETARY OF STATE

## AUGUST 12, 2003

# REQUEST FOR PROPOSALS
# ALABAMA SECRETARY OF STATE

**CONTENT**

_____ **Page**

I.      INTRODUCTION ............................................................................................3

II.     RESERVATIONS............................................................................................4

III.    PROJECT SCOPE AND OVERVIEW ...................................................5

IV.     OPTIONAL FEATURES: ............................................................................8

V.      FUNCTIONAL SPECIFICATIONS .........................................................8

VI.     SUBMISSION OF PROPOSALS............................................................11

VII.    PROJECT NARRATIVE............................................................................12

VIII.   PRICING.......................................................................................................20

IX.     SELECTION..................................................................................................21

X.      RESPONDENT'S CERTIFICATIONS ..................................................21

XI.     TERMS, ACRONYMS, AND ABBREVIATIONS .............................26

I. INTRODUCTION

A.    PURPOSE OF THIS DOCUMENT AND ISSUING AGENCY: This document, entitled a Request for Proposals for a Voter Registration System, is issued by the Office of the Secretary of State of Alabama (SOS). This Request for Proposals (RFP) is for the sole purpose of soliciting proposals for the development of a centralized computerized statewide Voter Registration System. The system will have a direct effect on all voter registration offices within the State of Alabama, requiring a centralized voter registration database along with electronic filing, management, and reporting for each voter registration office. The system must meet all requirements of federal and state laws concerning voter registration and shall become the property of the Secretary of State's office upon implementation.

B.    EXPRESSION OF INTEREST: Interested Vendors must notify SOS in writing of their interest in responding to this RFP. This Expression of Interest must be received no later than August 22, 2003. It may be sent by regular mail or via e-mail to the address shown below. A return e-mail address must be provided along with the Expression of Interest, as this will be used to respond to questions and any modifications in this RFP.

C.    CONTACT PERSON:    All Proposals and Expressions of Interest must be addressed to:

Trey Granger, Counsel for Public Affairs
Office of Secretary of State
600 Dexter Avenue
Montgomery, Al 36130
Email: rfp@sos.al.gov
Fax: (334) 242-4993

From the date of issuance of this RFP until the selection of a Contractor, if any, is announced, all questions concerning any part of this RFP shall be directed to the point of contact listed above. It is not permissible for any Respondent, or any entity working on behalf of a Respondent, to solicit information from any government source (Federal or State) other than from the official point of contact listed above. Any unauthorized solicitations for information that are reported are grounds for disqualification of the Respondent's Proposal.

D.    DUE DATE: Proposals must be received by SOS at the above address no later than 12:00 Noon (Central Time) on September 26, 2003. Respondent shall use the enclosed mailing label when forwarding proposal to SOS. Such label is to be adhered to the envelope or package securing the Respondent's proposal. All proposals should be presented in a sealed envelope/package. SOS will validate each envelope/package upon receipt; however, no proposal will be opened before

1:00 P. M. on September 26, 2003. Each Respondent is solely responsible for assuring that its proposal is received by the SOS Office or individual designated above prior to the due date established in the RFP. SOS shall not be responsible for late proposals, and late or incomplete proposals will not be accepted or considered. Also, no changes or supplements to the proposal will be allowed after the deadline, except for those provided for and/or requested by SOS. Faxed or e-mailed proposals will not be accepted.

E.    QUESTIONS REGARDING RFP:

    1.    Interested Respondents may submit **written questions** (preferably via e-mail) regarding this RFP to SOS.

    2.    Questions must be as short and concise as possible. Each question must cite the particular section of the RFP to which it relates.

    3.    All questions must be received by noon on August 29, 2003. Answers to written questions will be forwarded via e-mail by September 5, 2003, to all Respondents submitting a written Expression of Interest.

    4.    Follow-up questions to answers given in (3) above must be received by noon on September 12, 2003. Answers to follow-up questions will be forwarded via e-mail by September 19, 2003.

    5.    Any oral explanations or instructions given during the procurement process shall not bind SOS.

F.    COST: Respondents are solely responsible for paying all costs incurred as a result of responding to, and complying with, this RFP.

## II. RESERVATIONS

A.    PRE-SELECTION DISCRETION: SOS reserves the right, at its sole discretion, at any time and for any reason, to reject any, all, or any portion of the proposals submitted in response to this RFP, or to cancel the RFP, if it is deemed by SOS to be in its best interest to do so.

B.    POST-SELECTION DISCRETION: If a Proposal is selected, SOS reserves the right, at its sole discretion, at any time and for any reason, to change its decision with respect to the selection and to select another Proposal, or to cancel the RFP, if it is deemed by SOS to be in its best interest to do so.

C.    WAIVERS: Notwithstanding the amendment provisions otherwise set forth herein, SOS reserves the right, at its sole discretion, to waive any minor irregularity in an otherwise valid proposal which would not jeopardize the overall system and to award a contract on the basis of such a waiver in the event SOS determines that such award is in its best interest. Minor irregularities are those

which will not have a significant, adverse effect on overall system cost or performance and are determined at the sole discretion of SOS.

D.    NEGOTIATIONS: SOS reserves the right to negotiate with any applicant whose Proposal is within the competitive range with respect to technical plan and cost, as well as to select an applicant other than the applicant offering the lowest price, if it is determined by SOS to be in its best interest to do so.

E.    DISCLAIMER: Issuance of this RFP does not constitute a commitment by SOS to select any Proposal submitted in response to the RFP, or to award a contract to any applicant who responds to the RFP.

F.    NO GUARANTEE OF CONTRACT: Recommendation and/or selection of a Proposal **shall not** be binding upon SOS and may or may not, at SOS' sole discretion, result in SOS entering into a contract with the Respondent.

G.    ADOPTION OF IDEAS: SOS reserves the right to adopt to its use all, or any part, of a Respondent's Proposal and to use any idea or all ideas presented in a Proposal.

H.    ORAL PRESENTATIONS: SOS reserves the right to require all Respondents who pass the initial screening process to provide oral presentations of their Proposals. This presentation may require a demonstration showing that the services offered meet the specifications as described therein. Oral presentations, if determined necessary, will be made at a time determined by SOS. Respondent will be notified by e-mail if an oral presentation is requested for such Respondent.

I.    AMENDMENTS: SOS reserves the right to amend the RFP. Except as provided above with respect to "WAIVERS" made by SOS, all amendments to the RFP will be made by written addendum issued by SOS and will be mailed to all Vendors to whom the RFP was originally mailed.

III. PROJECT SCOPE AND OVERVIEW

A.    SCOPE: The Alabama Secretary of State (SOS) is the chief elections officer of the state whose jurisdiction, power, and duties are delegated by the Alabama Legislature. The SOS has been charged with the responsibility for the regulation of voter registration within the state. The SOS requires an interactive centralized computerized Voter Registration System which must comply with state and federal laws which provide for a centralized statewide database of all registered voters within the State of Alabama. The primary goals of this system are to provide for the entry, storage, retrieval, and reporting of voter registration information for each voter registration office within the state, as well as to provide interactive access to voter registration information for each probate judge's office and each circuit clerk's office within the state.

B.    DISTRICTING: The State of Alabama is divided into federal house districts, state senatorial districts, state house districts, state court districts, counties, and

municipalities. Counties are further divided into school board districts, commission districts, and fire districts; municipalities are further divided into school board districts and council districts. The voter registration system shall support any additional districts or precincts specified by the state or any county or municipality in order for it to conduct its elections. There are sixty-seven (67) counties within the state, each having one or more voter registration offices. There are an estimated 2,700,000 registered voters within the state. Each voter is assigned proper district and precinct numbers based on his or her residence address (a voter may be assigned to vote at different precincts for different types of elections). The precinct number corresponds to a polling place where the voter is expected to cast his or her vote for each election. There are approximately 2,300 precincts within the state of Alabama.

C.  DEMOGRAPHICS: The interactive centralized computerized voter registration system shall be administered by the Secretary of State's Office (SOS), and shall consist of demographic information such as name, residence address, mailing address, date of birth, race, sex, etc., as well as district and precinct information as discussed and any other information deemed necessary by the SOS to comply with federal and/or state laws pertaining to the voter registration system. Each voter record will be assigned a unique identifier as set forth in paragraph (E) below.

D.  TRANSACTIONS: All transactions against the voter registration database shall be retained by the system and properly archived as prescribed by prevailing statutory authority. A complete voting history of each registered voter shall be maintained by the system. Voter precinct and district information must be furnished by the system based on the residence address of the registrant. A means of address validation must also either be included in the system or recommended by the vendor. If a validation package is recommended, its cost is NOT to be included in the proposal total.

E.  IDENTIFIER ASSIGNMENT:  The system is to assign a unique identifier consisting of the 2-digit county number (01-67) concatenated with a seven digit sequential number. The system must also provide data fields for other identifiers: 1) driver's license number or non-driver's license number and 2) the last four digits of an applicant's social security number.  SOS must have access to various governmental (state and federal) agencies to validate the source of the identifier. Such agencies include, but are not limited to, the Alabama Department of Public Safety's (DPS) driver's license records to validate driver's and non-driver's license numbers, when provided by the applicant. (Network infrastructure exists, however a dedicated line may be required. Access does not currently exist.)

F.  MAINTENANCE OF VOTER REGISTRATION RECORDS: The centralized computer voter registration system shall be designed to accommodate the various statutorily designated processes and applications for the maintenance and administration of the voter list, to include purging of disqualified voters and the reactivation of the same. Selected sections of Chapter 4 of Title 17 of the Code of

Alabama, as amended, addresses the methodology and process that shall be administered in consideration of such provisions. Voter registration records which are marked as purged from the list of active records shall be coded to identify the cause of the purge. Various statutorily prescribed sources of information shall be utilized in this process and shall be considered in the Respondent's proposal. (Network infrastructure exists. A dedicated line may be required. Access does not currently exist.)

G.   VOTER REGISTRATION RECORDS FOR INACTIVE VOTERS: The system must provide the ability to flag voters as "inactive" when registrars have questions about a voter's registration qualifications (e.g., when there is a question about a voter's residence address). A registrant who has been flagged as "inactive" and wishes to be reactivated must complete and file with the voter registration office a voter update form to reactivate his or her record. A designation of "inactive" does not adversely affect a voter's voting rights, except to the extent that a voter must complete a voter update form to exercise his or her right to vote. Inactive voters must be included in all statistical reporting. Reports produced periodically regarding voter registration county-by-county and statewide must provide separate totals for active, inactive and both inactive and active voters, in addition to other demographic categories (e.g., race, age, gender).

H.   REPORTING: Reporting will include but not be limited to precinct lists, the various district lists, municipal lists, county lists, statewide lists, and statistical reporting. Proper precinct lists will be printed before each election. All lists and reports are to be "certified" to indicate they are produced by the state voter registration system.

I.   MASS MAIL-OUTS. The system must be able to print mass mail-out labels, envelopes or postcards presorted and in such formats to maximize SOS' ability to take advantage of mailing discounts available from the U.S. Postal Service (in First Class or Standard Mail classes, etc.). The system must be designed to the support or provide CASS certification for addresses (see "optional features"). The system must provide the ability to print mail-out materials on-demand, at the discretion of SOS, as well as to meet requirements of §17-4-201, Code of Alabama (1975). With regard to mail-outs required pursuant to §17-4-201, Code of Alabama (1975), the system must provide for the administration and maintenance of the suspense file that is created in conjunction with the specified mass mail-out, to include, but not limited to, tracking the specified data elements and automating the purge process for voters who have not voted or updated in the required period of time as set forth in the law.

J.   DAILY OPERATION: The voter registration system must be designed to prevent an interruption of day-to-day operations at the county registrars' offices and/or the SOS' office once implemented.

K.   LEGACY DATA MIGRATION: Implementation of the voter registration system will require the migration of current voter registration data (including district, precinct, etc.) stored on the Department of Finance Information Services Division

(ISD) mainframe system. A method of data validation and correction will be required. The area code for telephone numbers must be derived and included in the new database as the current database does not contain the area code.

L.    BAR CODING: The voter identification number is to be bar coded for scanning during the voter update process.

M.    DISTRICT AND PRECINCT ASSIGNMENT: The system requires the capability to identify precinct and district voting data based upon the residential address provided by the individual. The system requires the capability to perform redistricting and precinct changes with minimal involvement by the user.

IV. OPTIONAL FEATURES:

A.    MAPPING SYSTEM OPTION: As an option, a mapping system may be recommended to be installed at the state level to allow individual registrars the capability to identify the voting precincts and districts. The cost of this system is NOT to be included in the proposal total but should be listed as a proposed budgeting consideration in the addendum.

B.    SCANNING OPTION: An option to scan, store, retrieve, and print existing and subsequent voter registration cards may be priced as a separate item. The cards are currently being maintained at the voter registration offices. The cost of this system shall NOT be included in the proposal but should be listed as a proposed budgeting consideration in the addendum.

C.    CASS OPTION: As an option, a CASS certification for address support shall be priced as a separate item. The cost of this shall NOT be included in the proposal total but should be listed as a proposed budgeting consideration in the addendum.

V.  FUNCTIONAL SPECIFICATIONS

A.    SYSTEM RESIDENCE: The Voter Registration System centralized database shall reside only on the primary and hot site servers and shall serve as the official statewide voter registration list.  The primary server will be housed in the Information Systems Division of the Secretary of State's Office. One or more thin clients will reside at each voter registration office, each probate judge's office, and each circuit clerk's office.

B.    HOT SITE BACKUP: The system must provide for a hot site backup. A redundant server will serve as the hot site backup system, and shall perform load-balancing with the primary server. In the event that either server goes down, the remaining server shall take over automatically until the downed server is restored to operation. Each server shall have sufficient capacity in and of itself to carry the full load of the system in the event either server goes down.

C.   NETWORK CONNECTIONS: Network connections will need to be established for all counties connecting the Probate Judge's, Circuit Clerk's, and Registrar's offices to each other and the primary and hot site servers at the state level. Respondent shall recommend a network infrastructure topology for these connections. Respondent shall recommend any and all hardware, software, and cables that will need to be purchased in order to establish these connections and the approximate cost. Respondent shall state the approximate costs of ongoing leases, if any, for these connections. The costs of the hardware, software, cables, and any ongoing leases are NOT to be included in the proposal total. Respondent shall perform all installation, configuration, and testing of the network to ensure proper access to the voter registration system. All connections must be secure. Maintenance for these connections shall be included in the maintenance for the voter registration system.

D.   UNASSISTED LOCAL BACKUP: The system must provide unassisted local backup.

E.   USER FRIENDLY: The system must be user friendly.

F.   HELP SCREENS: The system must present help screens to assist the user.

G.   NO UNAUTHORIZED ACCESS: The system must prevent unauthorized access to its data.

H.   DISCRETIONARY ACCESS: The system must implement a discretionary access protection scheme (minimum C2 level protection).

I.   ROLE-BASED ACCESS: The system must internally provide role-based access to the data.

J.   DPS ACCESS: The system must be able to access DPS's system to verify driver's license information.

K.   DPH ACCESS: The system must be able to access DPH's vital statistics information for purging dead voters' registration records.

L.   AOC ACCESS: The system must be able to access AOC information for purging voters' registration records based on their having been convicted of a felony.

M.   EXISTING NETWORK: The system must operate on the existing 10BT network.

N.   FRAME RELAY: The system must operate on a minimum of frame relay.

O.   REMOTE CONTROL OF DESKTOP: The Respondent shall recommend software that will allow the remote takeover of a desktop by administrators. The cost of the software is NOT to be included in the proposal total.

P.   ANTIVIRUS, FIREWALL, INTRUSION DETECTION: The Respondent shall recommend hardware and software that will provide antivirus, firewall, intrusion

detection, etc. protection. The cost of the hardware and software is NOT to be included in the proposal total.

Q.     SYSTEM AVAILABILITY: The system must maintain   99% availability.

R.     AUDIT TRAILS: The system must provide an audit trail for all data-affecting transactions.

S.     DATA INTEGRITY: The system must ensure, protect, and validate the integrity of its data.

T.     ERROR LOGGING: The system must provide for the logging of errors and exceptions.

U.     TRAINING: The Respondent must provide user and administrator training. The training schedule and content of all training materials must be implemented in agreement with and approved by SOS so as to provide optimum benefit to SOS employees and users. Training must be provided at locations approved by the SOS.

V.     SYSTEM MAINTENANCE: Maintenance of the system must be provided through an annual maintenance agreement, which must specify service levels, covered items, and associated costs.   An option for yearly maintenance agreements for additional years must be provided. The cost for the additional years is NOT to be included in the proposal total.

W.     SYSTEM SUPPORT: System support must be provided for inquiries during normal work hours (Monday – Friday, 8 a.m. to 5 p.m. Central Time).

X.     TECHNICAL SUPPORT LOG: A log shall be maintained of all technical support issues, any actions taken, and resolutions.

Y.     HELP DESK: The Respondent is to recommend help desk tracking software. The cost of this software is NOT to be included in the proposal.

Z.     BACKUP AND RECOVERY DOCUMENTATION: Backup and recovery procedures must be documented either in the user's manual or the administrator's guide.

AA.     ACCEPTANCE TESTING: User acceptance testing must be completed at the SOS, State House building in Montgomery, Alabama. The respondent must provide a User Acceptance Plan.

BB.     QUALITY ASSURANCE: Quality Assurance Testing must be done at the unit, component and system level.

CC.     SPECIFICATION DOCUMENT: The Respondent must provide a Product Specification Document or Design Specification Document.

DD.    FUNCTIONING SYSTEM: The Respondent must provide an implemented and functioning system with acceptable response time.

EE.    MANUALS and GUIDES: The Respondent must provide two (2) users' manuals and two administrators' guides in hardcopy format along with softcopies of each on CD. SOS requests permission to reproduce both hardcopy and softcopy for distribution to users and administrators of the voter registration system. The vendor should also state the cost of additional printed copies. The cost for additional copies should not be included in the proposal cost.

FF.    IMPLEMENTATION DEADLINE: The Respondent is to begin implementation of the system no later than April 15, 2004 and all parallel processing, if any, shall be concluded on or before August 1, 2004. System testing shall begin no later than March 15, 2004.

## VI. SUBMISSION OF PROPOSALS

A.    NUMBER OF COPIES: The Respondent must submit one original printed copy of its Proposal along with eight (8) additional printed copies and a soft copy on a properly labeled CD which is to present ALL TECHNICAL AND PRICING DATA clearly and completely.

B.    SIGNATURES: The original Proposal must contain the original ink signature of the person(s) legally authorized to bind the Respondent to the Proposal. The original Proposal should be stamped or otherwise annotated so that SOS can easily identify which bears the original signature.

C.    NATURE AND FORMAT OF PROPOSALS: To be considered, the Proposal must be concise; describe the Respondent's ability to meet the RFP requirements; comply with the timeliness specifications of the RFP; and, provide a specific schedule of implementation that is consistent with the time constraints specified in the RFP. The Proposal must also be responsive to the content and format specifications, in sequence, specified in the RFP. All material submitted in response to this RFP shall become the property of SOS.

1.    Respondents should use exclusively 8½ x 11 white bond paper and should avoid the use of fancy bindings and promotional materials within the Proposal.

2.    The Proposal must include a **cover letter** with an original signature of the person(s) legally authorized to bind the Respondent to the Proposal. The cover letter shall also include a contact person who is authorized to act on behalf of the respondent.

3.    The **Project Narrative** should follow the cover letter. Number the pages of the Project Narrative, beginning the narrative with page 1. Page numbers should be centered in the bottom margin. The Project Narrative must follow the outline prescribed in Section VII of this RFP.

4.  The Project Narrative should be followed by a **Proposed Project Budget**, completed in accordance with pricing instructions contained in Section VIII of this RFP.

5.  The Proposed Project Budget should be followed by a **Budget Addendum**, which explains the items listed in the Proposed Project Budget. The budget addendum should include all optional and recommended items. The cost of these items should NOT be included in the Proposed Project Budget but should be listed as a proposed budgeting consideration in the addendum.

6.  The Budget Addendum should be followed by **a detailed financial statement** covering the Vendor's most recently concluded fiscal year, the current fiscal year and the projections for next fiscal year.

7.  The **Disclosure Statement,** as required by Act 2001-955, should follow the financial statement.

8.  References as described in Section X should be attached after the Disclosure Statement.

D.  TRADE SECRET INFORMATIION: Upon submission, all proposals become the property of the SOS. All information contained in proposals will remain non-public information until such time as a contract award is made. Upon contract award, all information contained in proposals will become public information except for information defined by the Respondent as being "Trade Secret Information." Proposal information that falls within the trade secret definition must be properly marked and identified by Respondents as "Trade Secret Information" or the proposal information will not be recognized as such by the SOS. Proposals that contain a blanket trade secret claim or that are substantially identified as "trade secret" will not receive any recognition by the SOS as trade secret information. Pricing and budgets within the proposal cannot be identified as "Trade Secret Information."

VII.    PROJECT NARRATIVE

A.  The Proposal must include a Project Narrative that addresses each of the following subheadings.

B.  RESPONDENT ORGANIZATION AND QUALIFICATIONS: The SOS requires a Respondent that has the necessary qualifications, skills, and resources to provide quality Voter Registration System services to the clients of the SOS. Previous experience in providing Voter Registration or Elections services, while desired, is not a requirement. Regardless, the SOS is adamant that Voter Registration System services shall continue unabated with no impact to its existing system during the transition to a new system. In order to be considered as a viable Voter

Registration System Contractor, Respondents in their proposal must demonstrate that not only can they provide the requested services, but also perform an on-time and successful conversion of Voter Registration services from the existing system to the new Voter Registration System.

1.    RESPONDENT QUALIFICATIONS and EXPERIENCE: The SOS is particularly interested in a Respondent that has substantial experience in developing, implementing and managing voter registration systems etc. In totality, the Respondent's experience, combined with that of any subcontractor(s) shall demonstrate the capability to successfully meet the requirements of this RFP. Therefore, the Respondent's proposal shall highlight its corporate capabilities, organizational structure, financial stability, and previous experience related to the requirements of this RFP.

2.    RESPONDENT'S CAPABILITIES:    Responses shall include the following:

Date the firm was established and ownership model;

Organizational and decision-making chart, relative to the Voter Registration System proposed; and

Prior and current litigation and/or formal administrative protests or actions such as notices of default, unsatisfactory performance, etc. involving state or federal government and private companies related to the quality or performance of voter registration or related services for any local, county, State or Federal government agency, public or private association, or private organization.

3.    RESPONDENT ORGANIZATION: The Respondent shall provide a proposed organization chart for the SOS' Voter Registration System project defining how the Respondent shall staff and manage the project. The response shall include a discussion of the proposed lines of authority, and how the project management team of the Respondent shall be involved in the administration of the services, including the coordination and communication internally and among all subcontractors.

4.    RESPONDENT PROPOSED KEY PERSONNEL: The Respondent shall provide a project team to be headed by an overall Project Manager whose responsibility it is to carry out the tasks in this RFP. The Contractor's Project Manager shall meet the following requirements:

Has three years of project management experience; and

Has successfully managed within the last five (5) years the implementation and/or operation of a voter registration system or other system of comparable size and similar complexity as defined within this RFP.

The resume of the proposed Project Manager for the Respondent shall be included within the response. The Project Manager shall start work on the project on the effective date of the contract and continue until the State's written acceptance of the successful conversion of the current Voter Registration System to new Voter Registration System.

Following a successful conversion, the Respondent may designate a different Project Manager responsible for the Voter Registration System contract that must maintain regular and frequent contact with the SOS and designated staff members. His or her appointment and continuing service is subject to SOS' approval. A replacement may be required for any legitimate performance reason at the SOS' option, and the replacement is also subject to SOS' approval.

Other key personnel from the Contractor subject to the approval of the State are:

- Technical Conversion Coordinator
- System Test Manager
- Technical System Lead

The following shall be clear in the proposal:

- A description of the project team to be assigned to the SOS' Voter Registration System  project, including position title, responsibilities, percent of time on the project, name and resumes of all key staff, and identification of positions to be hired upon contract award. If the design of the team will change during different phases of the project, this must be identified.

- The degree of coordination expected between the Project Manager and the SOS, to include notification to the SOS when potential or actual problems are identified.

- The decision making authority the Project Manager has within the organization in relation to this Voter Registration System project.

- A management structure ensuring adequate oversight and executive direction for the Project Manager. In this regard, the Respondent shall identify the corporate officer(s) to be contacted by SOS should major problems arise during the performance of the Contract. It shall be the responsibility of the corporate contact person(s) to return a telephone call received from the SOS or his/her designee within twenty-four hours of receipt.

- The lines of authority and communication that will exist within the project team.

The respondent must have the appropriate number and mix of project staff at all times during this project to ensure the successful transition and operations of the Voter Registration System. The SOS anticipates that full-time staff at the SOS site will not be required to successfully implement the conversion; however the Respondent is responsible to provide a plan whereby the Project Manager or designee is available on-site in the SOS within one (1) business day or within twenty-four (24) hours of the SOS' request at no cost to the SOS.

Interviews of key personnel may be conducted prior to award in order to determine acceptability on behalf of the SOS. If a change in key personnel after award is made, the Respondent shall present the replacement to the SOS, and the SOS will have right of refusal privileges. If any of the proposed key personnel or project manager is not currently in the employ of the Respondent, a letter of intent to accept employment shall be included in the response.

5.  SUBCONTRACTOR QUALIFICATIONS AND EXPERIENCE: Respondents may subcontract the performance of the required services with other entities or third parties. For purposes of this RFP, a subcontractor is defined as any entity under contract to the Respondent providing a service specifically defined and required within this RFP. When proposing the use of a subcontractor, the Respondent shall explain and document in writing the relationship between the subcontractor and the Respondent. In addition, organizational charts and a breakdown of duties between the subcontractor and the Respondent shall be provided.

Any changes in subcontractor(s) after the execution of this agreement shall first require written notification and prior approval by the SOS, which approval shall not be unreasonably withheld. The Respondent shall provide copies of all new contracts with subcontractor(s) (excluding pricing or proprietary information) on or before fifteen (15) business days of the effective date of such contracts. Upon receipt, SOS will have thirty (30) business days to review such contracts and provide in writing to the Respondent any concerns regarding the level of service that is required of such subcontractor(s) by Respondent in meeting its contractual obligations to SOS. The Respondent shall address each concern in writing to SOS no later than thirty (30) days from the receipt of SOS' concerns.

The responsibility for the performance of subcontractor(s) rests solely with the Respondent. If used, subcontractor(s) shall be made aware and adhere to the requirements specified within this RFP and the subsequent contract between the SOS and the Respondent. The Respondent shall

explain the subcontractor(s)' role by including the following minimum information in their response:

- Each subcontractor's name and address;

- The specific service(s) the subcontractor will be performing;

- Evidence of each subcontractor's intent to participate, including a signed letter by an authorized representative;

- Description of relevant qualifications, capabilities, and resources;

- A contingency plan to cover any subcontractor stoppage;

- A security plan to comply with the requirements in this RFP; and

- Three (3) references for each subcontractor, to include contact names, addresses, and telephone numbers, and a description of the services currently being provided.

- A copy of contracts with all subcontractors with copies of same to be provided no later than the date of contract execution by the Respondent.

C.    PROJECT MANAGEMENT:  The SOS envisions the Voter Registration System project consisting of four generally sequential (although there may be some overlap) phases.  These phases are:

- Design
- Development
- Transition
- Maintenance

Because of the many possible factors impacting the timeline required for the design, development, and transition to the new system, the SOS does not intend to prescribe any set period of time for each of the respective phases. The Respondent is required to define the anticipated timelines and estimated completion dates for the project deliverables within each phase in a draft Project Work Plan submitted with their proposal.  However, the transition from the Current Voter Registration system to the new Voter Registration System must be completed within nine (9) months (or sooner) following the signing of the contract between the Respondent and SOS.

1.    PROJECT WORK PLAN: The Respondent's Project Work Plan shall be based on the Respondent's proposal.  The plan shall include, at a minimum, a schedule of all tasks and deliverables required through the

project. The plan should identify the individual tasks and deliverables by project phase, as defined below. This plan shall identify all critical path and dependency tasks and delineate the responsibilities of the Respondent, the State and Federal agencies. The Respondent shall submit a preliminary Project Work Plan no later than three weeks after signing of a contract. The SOS shall review and comment on the plan within ten working days. The final Project Work Plan shall be provided ten working days following the receipt of the comments from the SOS.

The Respondent shall provide a proposed work plan in their response.

2.   DESIGN PHASE: The timeframe for the deliverables from the Project Design Phase shall be based upon tasks and deliverables identified within the Project Work Plan. The Design Phase shall commence with the signing of a contract and shall continue for the timeframe identified within the Respondent's response and proposed work plan and mutually agreed upon the by the SOS and the Respondent. All deliverables identified within the project plan are subject to State review and approval. The Respondent shall allow an appropriate time for the SOS to review and comment upon the deliverable.

a)   TRANSITION PLAN: The Respondent shall be responsible for the migration of the current Voter Registration System database to the new Voter Registration System. The Respondent shall prepare a migration plan that covers each of the following activities in detail:

- Device deployment and installation,

- Migration of the Voter Registration database

The plan shall address the processes to be used for the migration, how the processes shall be tested, and contingency plans for problems and issues that may occur during the migration. The migration plan shall also address verification and validation of the migration process, in particular the validation of the voter registration records that are converted to the new system. The Respondent shall submit the final Transition Plan no later than two (2) months after contract signing.

b)   FUNCTIONAL DESIGN DOCUMENT: This document shall, at a minimum, provide a functional overview and a description of the operating environment, procedures and workflow of the Voter Registration System. The Respondent shall submit the final Functional Design Document no later than two (2) months after contract signing.

c)  DETAILED DESIGN DOCUMENT:  The Detailed Design Document shall describe the total system configuration including system hardware, functionality, file layouts, message and file flows, ARU Scripts, data elements, system interfaces, and the system security plan. The Respondent shall submit the final document no later than three (3) months after contract signing.

d)  TEST PLAN: The Respondent shall develop system test plans during the Design Phase.  Test plans shall, at a minimum, outline the test purpose, methodology, environment, and approval rating system.  Test plans shall be developed for the Functional Demonstration, System Acceptance Test, System and Network Capacity Test, ARU Test, and the System Interface Test.  The final System Test Plans shall be submitted no later than three (3) months after contract signing.

e)  BACKUP AND RECOVERY PLANS:  The Respondent shall provide an evaluation of the types of service interruptions that may impact the Voter Registration System's operations and therefore require the use of a backup and recovery process.  For each potential interruption type, the Respondent shall, at a minimum, detail the steps to be taken to survive and recover from the interruption.  The plan shall include provisions to ensure voter registration continues. In addition, the Contractor shall outline the resources committed to each proposed contingency plan (i.e., people, systems, telephone lines, and operation sites) and indicate whether the contingency plan has been tested under real or simulated conditions. The final Back-up and Recovery Plan shall be submitted no later than three (3) months after contract signing.

f)  SYSTEM SECURITY PLAN: The Respondent shall prepare a security plan detailing, at a minimum, the security provisions and proposed user profiles established within the Voter Registration System.  The Respondent shall submit the final System Security Plan no later than three (3) months after contract signing.

g)  TRAINING PLAN: The Respondent shall prepare and submit a Comprehensive Training Plan that identifies the proposed deadlines and supportive tasks for the planning, design, development, production and distribution of all training materials. The training plan should address the timeline for creation of the deliverables, and the timeframe for training the SOS and county office staff.   The plan should outline deliverable dates of training products with sufficient time allowed for SOS review and approval. The Respondent shall

submit the Training Plan no later than three (3) months after contract signing.

h)    SYSTEM ACCEPTANCE TEST PLAN: The system acceptance test provides both SOS and local voter registration representatives the opportunity to test the Voter Registration System functionality and ensure compliance with the system design requirements. This test shall consist minimally of functional requirements, security, recovery, system controls, and "what if" testing. In addition, as part of the system acceptance testing, the Respondent must demonstrate the methods and processes for performing daily reconciliation between the SOS and Respondent interface and processing activities. During the formal test script portion of the acceptance test, testing representatives will follow detailed test scripts developed by the Respondent. The test scripts should cover all facets of the system's operations and test all of the system processing options and environmental conditions.

The ad hoc or "what if" portion of the acceptance test provides the SOS and local voter registration representatives the opportunity to include various transaction sets and sequences that have not been included in the test scripts and to challenge the system's operations and design. The Respondent shall submit The System Acceptance Test Plan no later than three (3) months after contract signing.

D.    ORGANIZATIONAL STRUCTURE AND MANAGEMENT SUMMARY: Provide a brief (no more than five pages) summary about the Vendor's organization, including the following:

1.    GOVERNING BOARD AND OTHER AGENTS: The names, titles and responsibilities of the entire Vendor's governing board of directors, officers, and paid consultants (not specifically listed in VII B).

2.    HISTORY: A brief history of the formation and development of the Respondent's organization, with the date of incorporation or, if unincorporated, the date the business began; other projects operated in the past and currently; and prior names of the organization, if any.

3.    FINANCIAL AUDIT: The date of the respondent's most recent financial audit and name of the audit firm.

4.    QUALIFICATIONS AND EXPERIENCE OF RESPONDENT: The Respondent's qualifications and experience for assuring the successful completion of the requirements of this RFP. It must include a description of past or current experience in providing the proposed services and, as applicable, the rate of successful delivery. It must

further describe any applicable licenses and/or certifications held by the Respondent.

5.    CAPACITY:  The Respondent's organizational and administrative capacity, and financial capacity, to meet the requirements of the RFP.

E.    REQUIREMENTS: Address in outline form each of the system requirements and how Respondent will meet all requirements.

VIII.    PRICING

Each response should provide prices for professional services only. **No equipment is to be priced in the proposal.** Prices for optional items discussed in the system overview are to be stated separately and are NOT to be included in the proposal total price. Prices are to be stated for items within categories as follows, with a total for each category and a grand total following the Technical Support Log category.

A.    DESIGN

B.    DEVELOPMENT

C.    TRANSITION:  Data from the existing system must be migrated to the new voter registration system. The telephone area code must be derived and included in the new system as it is not in the current system.

D.    MAINTENANCE: A price is to be provided for a yearly system maintenance (software and hardware) agreement and is to be included in the proposal total. Pricing for annual agreements for additional years is to be provided but is NOT to be included in the proposal total. (This issue will be addressed in ancillary documents and will be specifically set forth in the contract between the Respondent and the SOS, if any.)

E.    SYSTEM SUPPORT  - A price is to be provided for the cost of system support (8:00 A.M. to 5:00 P.M.  Central time Monday – Friday) for a period of one year and is to be included in the proposal total.  Pricing for additional years is to be provided as an option but is NOT to be included in the proposal total. (This issue will be addressed in ancillary documents and will be specifically set forth in the contract between the Respondent and the SOS, if any.)

F.    TECHNICAL SUPPORT LOG – Pricing is to be provided for the cost for one year of a log of all technical support issues, actions taken, and resolutions. Annual pricing for additional years is to be provided as an option but is NOT to be included in the proposal total.  (This issue will be addressed in ancillary documents and will be specifically set forth in the contract between the Respondent and the SOS, if any.)

G.    OPTIONAL ITEMS: Optional items are to be priced separately and are NOT to be included in the proposal total.

IX. SELECTION

A.    GENERAL:  SOS will appoint a Proposal Evaluation Committee (PEC) and a Chairperson of that Committee. The Chairperson will be neither the SOS nor the Contact Person identified in Section I-C of this RFP, as the SOS and Contact Person will not serve on the PEC.  The Committee will review and evaluate Proposals received from eligible Respondents in response to this RFP and, if a recommendation is made, will make its recommendation to SOS in accordance with the general criteria defined below.

B.    BASIS OF RECOMMENDATION:  A comparative scoring process, using detailed criteria, will be used to measure the degree to which each Proposal meets the following general evaluation criteria, with a maximum of 100 points possible:

1.    The Respondent's overall approach in providing a comprehensive plan for furnishing a Centralized Computerized Statewide Voter Registration System as set forth in this RFP. **(WEIGHT: maximum of 30 points)**

2.    Technical compliance with the requirements of the RFP.  **(WEIGHT: maximum of 10 points)**

3.    Qualifications and experience of the Respondent to successfully complete a contract to carry out the proposed services.  **(WEIGHT: maximum of 15 points)**

4.    The Respondent's demonstrated ability, organizational capacity, financial stability and capacity to carry out the services as specified in the RFP. **(WEIGHT: maximum of 15 points)**

5.    Reasonableness and amount of the proposed cost. **(WEIGHT: maximum of 30 points)**

6.    SOS may determine other criteria, in addition to, or in lieu of, the criteria described above, as it deems necessary and appropriate.

X. RESPONDENT'S CERTIFICATIONS

A.    By submitting a Proposal in response to this RFP, the Respondent warrants and represents to SOS that the Respondent accepts and agrees with all of the terms and conditions of the RFP.  Further, by so submitting the Respondent certifies to SOS that the Respondent is legally authorized to conduct business within the State of Alabama and to carry out the services described in this RFP and that all of the following statements are true, complete and correct.

B.    REVOLVING DOOR POLICY:  The Respondent warrants that neither the Respondent nor any of the Respondent's trustees, officers, directors, agents, servants or employees is a current employee of SOS, and none of the said individuals have been employees of SOS within the ten (10) year period ending with the date of this RFP.

C.    DEBARMENT:  Neither the Respondent nor any of the Respondent's trustees, officers, directors, agents, servants or employees (whether paid or voluntary) is debarred or suspended or otherwise excluded from or ineligible for participation in federal assistance programs under Executive Order 12549, "Debarment and Suspension."

D.    COLLUSION WITH OTHER VENDORS:    The Respondent certifies by submission of this Proposal and resultant contract that the Respondent has not publicly or privately colluded with any other Respondent to fix prices or conditions of this contract. This does not preclude joint ventures with other companies. (Any Respondent with a Joint Venture partner, not qualified and set forth as a sub-contractor, must execute and include an Organizational Structure and Management Summary for the Joint Venture partner, as established in VIII D 1-5.)

E.    COMPLIANCE:  If SOS elects to execute a contract with the Respondent for services on the basis of the proposal, the Respondent will comply with the following requirements:

1.    TIMELY SUBMISSION:    Reports and data delineated in the Respondent's implementation plan, and such other reports and data as may otherwise be required by SOS, will be submitted to SOS on a timely basis and in accordance with the format and instructions provided by SOS.

2.    PROGRESS REVIEW:    SOS may, at its sole discretion, require periodic walk-throughs and progress reports as documentation of the Respondent's completion of the deliverables, and the Respondent will comply with these requirements at such times and in such manner and format as may be required by SOS.

3.    PROGRAM AUDITS AND RECORD KEEPING:  The Respondent will comply with financial and programmatic audits as well as record keeping requirements as may be established by SOS.

4.    ACCESS TO RECORDS:  The Respondent will keep and maintain, to SOS' satisfaction, adequate programmatic, accounting and fiscal books, accounts, records and procedures to account for all funds provided from all sources to pay the costs of carrying out any contract resulting from this RFP.  The Respondent will further permit, at any reasonable time any authorized personnel full access to financial books, accounts, files, records, ledgers, documents, statistical reports, accounting procedures, practices and any other items (hereinafter collectively referred to in this paragraph as "records") of the Respondent pertaining to all funds regardless of the source(s) of funding, associated directly or indirectly with the performance of any contract resulting from this RFP in order to audit, examine and make excerpts of the said records. Respondents

desiring to avoid this requirement with respect to funds received from other sources must:

a)     Maintain separate accounts, books and records, i.e., assure that contract funds received from SOS are not commingled with funds received from other funding sources;

b)     Assure that direct costs associated with carrying out the contract program are not shared across multiple funding sources; and,

c)     Assure that indirect costs associated with carrying out the contract are not allocated to SOS.

5.     INVESTIGATIONS: The Respondent will fully cooperate and assist SOS, its agents or assigns, in any investigations of compliance.

6.     STANDARD CONTRACT: The Respondent will agree to the use of SOS' standard contract document(s). The Respondent will further comply with all the terms and conditions of that document(s) and all other federal and state laws, rules and regulations applicable to receiving funds from SOS to carry out the services described in this RFP. Further, any contract executed pursuant to the RFP shall be subject to review by SOS' legal counsel as to its legality of form and compliance with State contract laws, terms and conditions, and may further be subject to review by the Alabama Legislative Contract Review Oversight Committee, Examiners of Public Accounts, or other parties designated by the SOS.

7.     CODE OF CONDUCT: The Respondent will maintain a written code of conduct consistent with applicable federal, state and local laws, regulations and ordinances, governing the performance of directors, officers, employees, contractors, and relatives of the said individuals, and governing their public disclosure related to ethical conduct, conflict of interest, involvement in political activities and personal, financial and economic interests. The document further will contain appropriate sanctions for a failure at any level to follow the established standard.

8.     CONFIDENTIALITY: The Respondent will comply with any requirement imposed by SOS to sign a Confidentiality Agreement indicating the Respondent's willingness to comply with applicable Federal or State laws, regulations or requirements pertaining to client confidentiality.

9.     INVOICING INFORMATION: SOS will make NO advance payments. Therefore, all invoices shall be submitted in arrears on a monthly basis.

10.     MONITORING AND EVALUATION: SOS shall have the right to withhold payment to the Respondent for failure by the Respondent to

carry out any of its contractual obligations. This includes the result of unsatisfactory audit findings, physical security reviews or other negative monitoring results. Such a right to withhold shall continue until the Respondent remedies such failure to perform, provided however that written notice of such failure has been communicated to the principal office of the Respondent by certified mail. The Respondent will take immediate corrective action to resolve any negative findings by SOS.

11.     OTHER RESPONDENT RESPONSIBILITIES: SOS will consider the selected Respondent to be the major point of contact regarding contractual matters, including performance of services and the payment of any and all charges resulting from contract obligations. The Respondent will provide prompt, efficient and courteous service, and avoid undue interference with other State operations. SOS must approve all subcontractors (See paragraph VII- B- 4).

12.     NEWS RELEASES: No news release, press conferences or advertisement pertaining to this solicitation, or to awards made as a result of this solicitation, will be made without prior written approval of SOS' Office.

13.     WORKSPACE AND EQUIPMENT: The Respondent must provide its own workspace and equipment needed to carry out the services required under this RFP.

F.     FINANCIAL ACCOUNTING: The Respondent's accounting system is consistent with Generally Accepted Governmental Accounting Principles (GAAP). Further, the applicant maintains sufficient financial accounting records to allow the Respondent to account for and document the source and application of all funds from all sources, including, as applicable, required matching funds.

G.     FINANCIAL AUDIT: The Respondent will, upon SOS' request, provide a copy of its most recent audited financial statement. (The statement should not be submitted with the Proposal).

H.     COMPETENCY: At SOS' request the Respondent will be required to furnish promptly any information that they may consider necessary to establish their competency to perform the work.

I.     REFERENCES: The Respondent shall provide the identification of at least three (3) references currently using the application services which are the same or essentially the same or substantially similar to those specified herein. These services must have been operational for a minimum period of two (2) years. A brief description of the services must be provided along with the name, title, business address, and telephone number of the client to contact regarding the services provided. The SOS reserves the right to contact each client listed in the proposal.

J.      PROPOSAL LIFE: The Proposal submitted to SOS in response to this RFP will be binding on the Respondent for ninety (90) calendar days following the due date prescribed in the RFP.

K.      PERFORMANCE BOND: Upon award, the Respondent will be asked to provide SOS, within ten (10) working days of notification of award, a performance bond, approved by SOS, in the amount of fifty percent (50%) of the Proposal Grand Total as a guarantee of the satisfactory performance of the services proposed. The performance bond must be in force for the entire life of the contract. In the event the Respondent fails to deliver or perform to the satisfaction of SOS, the contracting authorities for SOS reserve the right to proceed against the performance bond and to cancel any associated agreements without any resulting liability, present or future to SOS.

L.      INSURANCE: Upon award, the Respondent will be asked to Provide SOS within ten (10) working days of notification of award, certificates of insurance from an entity licensed to provide insurance within the State of Alabama. The Respondent will carry and maintain, during the entire period of performance under this contract, the following:

1.      Worker' Compensation and Employee's Liability insurance with a minimum of $100,000 per incident,

2.      Comprehensive General Liability with a minimum of $3 million bodily injury per occurrence,

3,      Bonding of Vendor employees (permanent, temporary or contracted) with a minimum of $100,000 per incident.

Certificates of Insurance will be necessary for any and all sub-contractor(s), joint venture partner(s), or related entity of the Respondent.

## XI.  TERMS, ACRONYMS, AND ABBREVIATIONS

General Acronyms and Abbreviations

| | |
|---|---|
| AOC | Administrative Office of the Courts |
| DPH | Department of Public Health |
| DPS | Department of Public Safety |
| GAAP | Generally Accepted Governmental Accounting Principles |
| RFP | Request For Proposals |
| SOS | Secretary of State |
| PEC | Proposal Evaluation Committee |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**NANCY L. WORLEY**
SECRETARY OF STATE



First Floor, State Capitol
Suite S-105
600 Dexter Avenue
P.O. Box 5616
Montgomery, Alabama 36103-5616

# State of Alabama

## Notice of Amendment to Request for Proposals

*Notice is hereby given to all vendors who responded to the Secretary of State's Request for Proposals ("RFP") of August 12, 2003 that the RFP has been amended. This notice is sent via Federal Express with proper postage affixed, on this the 18th day of August, 2005.*

This document is to serve as official notice that the last sentence in Section A of the Introduction of the Request for Proposals ("RFP") of August 12, 2003, is hereby amended. The initial version stated:

*The system must meet all requirements of federal and state laws concerning voter registration and shall become the property of the Secretary of State's office upon implementation.*

The amended version is as follows:

*The system must meet all requirements of federal and state laws concerning voter registration and <u>shall be administered by the Secretary of State's office pursuant to a licensing agreement.</u>*

**If this amendment impacts the proposal you submitted in September of 2003, please submit any revisions in writing with original language stricken and new language, including pricing adjustments, underlined. Please submit any revised or amended pages (do not resubmit the entire proposal) of your proposal to this office on or before 4:00 P.M. on Thursday, September 1, 2005.**

Our office announced on May 27, 2005, that we would begin negotiations with Diebold to implement a centralized voter registration system in Alabama; however, the Voter Registration System Contract <u>has not</u> been awarded due to an impasse on issues that have not been resolved during our sessions with representatives of that vendor. On August 17, 2005, we ended negotiations with Diebold so that the RFP could be amended to clarify the acknowledgment of this office's decision to administer the selected system pursuant to a licensing agreement.

In contemplation of the pending Federal and State implementation deadlines, this notice is being forwarded only to those vendors who submitted a proposal to the Alabama Secretary of State's Office pursuant to the original version of the Request for Proposal in September of 2003.

All vendors should be aware that a modified implementation schedule will be employed by this agency upon the award of a voter registration contract issued, if any, pursuant to this Request for Proposal, as amended.

Thank you for your prompt attention to this matter. Please feel free to contact Al Austin, Voter Registration Project Manager, in my office with any questions you may have regarding this amendment.

# EXHIBIT

# B

# County System Contacts

| County Name | Use ALVIN | Other System |
|---|---|---|
| Autauga | Yes | Yes / Syscon |
| Baldwin | Yes | Yes / In-House System |
| Barbour | Yes | No |
| Bibb | Yes | Yes / S&W Computer Systems |
| Blount | Yes | No |
| Bullock | Yes | No |
| Butler | Yes | No |
| Calhoun | Yes | Yes / Delta Computer Systems |
| Chambers | Yes | Yes / Syscon |
| Cherokee | Yes | No |
| Chilton | Yes | Yes / Delta Computer Systems |
| Choctaw | Yes | No |
| Clarke | Yes | No |
| Clay | Yes | No |
| Cleburne | Yes | No |
| Coffee | Yes | Yes / Gemini Consultants |
| Colbert | Yes | Yes / In-House System |
| Conecuh | Yes | No |
| Coosa | Yes | No |
| Covington | Yes | Yes / In-House System |
| Crenshaw | Yes | No |
| Cullman | Yes | No |
| Dale | Yes | Yes / Gemini Consultants |
| Dallas | Yes | No |
| Dekalb | Yes | No |
| Elmore | Yes | No |
| Escambia | Yes | No |
| Etowah | Yes | Yes / In-House System |
| Fayette | Yes | Yes / Gemini Consultants |
| Franklin | Yes | Yes / Syscon |
| Geneva | Yes | No |
| Greene | Yes | No |
| Hale | Yes | No |
| Henry | Yes | No |
| Houston | Yes | Yes / Syscon |
| Jackson | Yes | No |
| Jefferson | No | Yes / ES&S |
| Lamar | Yes | No |
| Lauderdale | Yes | No |
| Lawrence | Yes | Yes / Syscon |
| Lee | Yes | Yes / In-House System |
| Limestone | Yes | Yes / S&W Computer Systems |
| Lowndes | Yes | No |
| Macon | Yes | Yes / S&W Computer Systems |

| | | |
|---|---|---|
| Madison | Yes | Yes / In-House System |
| Marengo | Yes | Yes / S&W Computer Systems |
| Marion | Yes | No |
| Marshall | Yes | No |
| Mobile | No | Yes / In-House System |
| Monroe | Yes | No |
| Montgomery | Yes | Yes / In-House System |
| Morgan | Yes | Yes / In-House System |
| Perry | Yes | No |
| Pickens | Yes | Yes / Gemini Consultants |
| Pike | Yes | No |
| Randolph | Yes | No |
| Russell | Yes | No |
| Shelby | Yes | Yes / In-House System |
| St. Clair | Yes | Yes / Gemini Consultants |
| Sumter | Yes | No |
| Talladega | Yes | Yes / In-House System |
| Tallapoosa | Yes | No |
| Tuscaloosa | Yes | Yes / In-House System |
| Walker | Yes | Yes / Syscon |
| Washington | Yes | No |
| Wilcox | Yes | No |
| Winston | Yes | No |

# EXHIBIT

# C

# State of Alabama Postcard Voter Registration Form

**FOR USE BY U.S. CITIZENS ONLY ◆ FILL IN ALL BOXES ON THIS FORM ◆ USE INK ◆ DO NOT USE A PENCIL ◆ PRINT**

**You can use this form to:**
- ▶ Register to vote in Alabama.
- ▶ Update your voter registration record, if you have changed your name or address.

**Deadline for submitting application:**
Registration and updating of voter records cut off ten days prior to each election in Alabama.

**To register to vote in the State of Alabama, you must:**
- ▶ Be a citizen of the United States.
- ▶ Reside in Alabama.
- ▶ Be at least 18 years of age on or before election day.
- ▶ Not have been convicted of a disqualifying felony, or if you have been convicted, you must have had your civil rights restored.
- ▶ Not have been declared "mentally incompetent" by a court.

---

Are you a citizen of the United States of America? ☐ Yes ☐ No    Will you be 18 years of age on or before election day? ☐ Yes ☐ No
*If you check "no" in response to either of these questions, do not complete this form.*

---

① **Print Your Name:** Last    First    Middle

**Driver's License Number:**
If you do not have a driver's license, then list the last four digits of your social security number.

② **Print Maiden Name / Former Name (if reporting a change of name)**

**ID Requested:** You may send with this application a copy of a current and valid photo identification, government check, paycheck, or other government document that shows your name and address. You will be required to present identification when you vote absentee or at your polling place.

③ **Home Telephone** (   )    ④ **Work Telephone** (   )    ⑤ **Inside City Limits?** ☐ Yes ☐ No    **If yes, please name the city:**    ⑥ **County where you live**

⑦ **Addresses — Current**

| | | City | State | ZIP |
|---|---|---|---|---|
| **Address where you live:** (Do not use post office box) | Print House Number and Street | City | State | ZIP |
| **Address where you receive your mail:** | Print House Number and Street (or PO Box) | City | State | ZIP |
| **Old — Address where you were last registered to vote:** (Do not use post office box) | Print House Number and Street | City | County | State | ZIP |

---

⑧ **Date of Birth** (month, day, year)    ⑪ **Place of Birth** City    County    State    Country

⑨ **Race (check one)**
☐ White ☐ Black
☐ Asian ☐ American Indian
☐ Hispanic ☐ Other

⑩ **Sex (check one)**
☐ Female ☐ Male

**REGISTRARS USE ONLY**
County Pct _____
City Pct _____
DATE APPROVED
Board member
Board member
Board member

⑫ **Map / Diagram**
If your house has no street number or name, please draw a map of where your house is located. Please include roads and landmarks.

⑬ **Did you receive assistance?**
If you are unable to sign your name, who helped you fill out this application? Give name, address, and phone number (phone number is optional).

**VOTER DECLARATION - READ AND SIGN**

- ▶ I am a U.S. citizen
- ▶ I live in the State of Alabama
- ▶ I will be at least 18 years of age on or before election day
- ▶ I am not barred from voting by reason of a disqualifying felony conviction
- ▶ I have not been judged "mentally incompetent" in a court of law

I SOLEMNLY SWEAR OR AFFIRM TO SUPPORT AND DEFEND THE CONSTITUTION OF THE UNITED STATES AND THE STATE OF ALABAMA AND FURTHER DISAVOW ANY BELIEF OR AFFILIATION WITH ANY GROUP WHICH ADVOCATES THE OVERTHROW OF THE GOVERNMENTS OF THE UNITED STATES OR THE STATE OF ALABAMA BY UNLAWFUL MEANS AND THAT THE INFORMATION CONTAINED HEREIN IS TRUE, SO HELP ME GOD.

Your Signature: _____    Date: _____
**WARNING!**    If you falsely sign this statement, you can be convicted and imprisoned for up to five years.

## Questions? Do you need assistance?

Please call your county Board of Registrars at the number listed on the back of this form.
You may also call the Elections Division of the Secretary of State's office at 334-242-7559.
**Secretary of State Nancy L. Worley**
**1-800-274-VOTE (1-800-274-8683) or 334-242-7210**

# State of Alabama Agency-Based Voter Registration Form

**FOR USE BY U.S. CITIZENS ONLY ◆ FILL IN ALL BOXES ON THIS FORM ◆ USE INK ◆ DO NOT USE A PENCIL ◆ PRINT**

**To register to vote in the State of Alabama, you must:**
- ▶ Be a citizen of the United States.
- ▶ Reside in Alabama.
- ▶ Be at least 18 years old on or before election day.
- ▶ Not have been convicted of a disqualifying felony, or if you have been convicted, you must have had your civil rights restored.
- ▶ Not have been declared "mentally incompetent" by a court.

**FOR USE BY AGENCY OFFICIAL ONLY**
Check one (1) box:
- ☐ Registrars
- ☐ Motor Voter
- ☐ State Designated Agency
- ☐ Agency-Based
- ☐ Disabilities Services Office

Signature of Agency Representative

Business Phone of Agency Representative

Are you a citizen of the United States of America? ☐ Yes ☐ No    Will you be 18 years of age on or before election day? ☐ Yes ☐ No
If you check "no" in response to either of these questions, do not complete this form.

① Print Your Name:  Last    First    Middle

**Driver's License Number:**
If you do not have a driver's license, then list the last four digits of your social security number.

② Print Maiden Name / Former name (if reporting a change of name)

ID Requested: You may send with this application a copy of a current and valid photo identification, government check, paycheck, or other government document that shows your name and address. You will be required to present identification when you vote absentee or at your polling place.

③ Home Telephone    ④ Work Telephone    ⑤ Inside City Limits?  If yes, please name the city:    ⑥ County where you live
(     )    (     )    ☐ Yes  ☐ No

⑦ **Addresses** — **Current**

| | Address where you live: (Do not use post office box) | Print House Number and Street | City | State | ZIP |
| | Address where you receive your mail: | Print House Number and Street (or PO Box) | City | State | ZIP |
| **Old** | Address where you were last registered to vote: (Do not use post office box) | Print House Number and Street | City | County | State | ZIP |

⑧ Date of Birth  (month, day, year)

⑪ Place of Birth    City    County    State    Country

⑨ Race (check one)
- ☐ White
- ☐ Asian
- ☐ Hispanic
- ☐ Black
- ☐ American Indian
- ☐ Other

⑫ Map / Diagram
If your house has no street number or name, please draw a map of where your house is located. Please include roads and landmarks.

⑬ Did you receive assistance?
If you are unable to sign your name, who helped you fill out this application? Give name, address, and phone number (phone number is optional).

⑩ Sex (check one)
- ☐ Female
- ☐ Male

**REGISTRARS USE ONLY**
County Pct _____
City Pct _____
DATE APPROVED _____
Board member _____
Board member _____
Board member _____

**VOTER DECLARATION - READ AND SIGN**
- ▶ I am a U.S. citizen
- ▶ I live in the State of Alabama
- ▶ I will be at least 18 years of age on or before election day
- ▶ I am not barred from voting by reason of a disqualifying felony conviction
- ▶ I have not been judged "mentally incompetent" in a court of law

I SOLEMNLY SWEAR OR AFFIRM TO SUPPORT AND DEFEND THE CONSTITUTION OF THE UNITED STATES AND THE STATE OF ALABAMA AND FURTHER DISAVOW ANY BELIEF OR AFFILIATION WITH ANY GROUP WHICH ADVOCATES THE OVERTHROW OF THE GOVERNMENTS OF THE UNITED STATES OR THE STATE OF ALABAMA BY UNLAWFUL MEANS AND THAT THE INFORMATION CONTAINED HEREIN IS TRUE, SO HELP ME GOD.

Your Signature: _____    Date: _____

**WARNING!**   If you falsely sign this statement, you can be convicted and imprisoned for up to five years.

**Questions? Do you need assistance?** Please call your county Board of Registrars
You may also call the Elections Division of the Secretary of State's office at 334-242-7559
Secretary of State Nancy L. Worley 1-800-274-VOTE (1-800-274-8683) or 334-242-7210

# EXHIBIT

# D

April 21 2006

To: Boards of Voter Registration
From: Nancy L. Worley, Secretary of State
Re: (1) 24-Hour Data Submission
    (2) Reports of Political Activity
    (3) Confidentiality of Voter Lists

<u>Beginning May 1, 2006, you are responsible for DAILY updates to ALVIN,</u> our statewide computer database of registered voters. For counties which use the ALVIN system only, this should not be a change from your usual operation. For counties which use a county-owned system and regularly send data to us on a diskette or email the data to ALVIN, you will need to make sure this data is sent to ALVIN every 24 hours. If you send your voter registration data by U.S. Mail, you will need to send it by overnight mail. This is necessary to comply with HAVA (Help America Vote Act).

<u>There should be NO political activity in the Offices of Voter Registration.</u> We have had some very serious reports of partisan politics in voter registration offices over the last few weeks. In one case an individual stopped by a voter registration office (incorrectly) to ask about being a pollworker and was asked his or her political party affiliation. When the individual asked why he or she should give that information, the Registrar reportedly said, "We only sign up people who are (name of party) in this office."

Another serious complaint was registered that one specific political party's information was placed on the Voter Registration Office counter and the other political party's information was thrown away. Since Voter Registration Offices are available to assist ALL PEOPLE WITH VOTER REGISTRATION MATTERS, regardless of their political views, ethnicity, etc., it is unwise to show any political bias.

<u>Keep voter lists CONFIDENTIAL.</u> Your Probate Judge and Circuit Clerk are fellow election officials; therefore, they are given access to the same information you have for election purposes only; however, Registrars are the ONLY election officials who can change voter records. We have had another complaint filed about a Registrar who has given the Circuit Clerk in his/her county regular updates of the voter list for that individual to send birthday cards, political materials, etc. DO NOT CREATE A LAWSUIT SITUATION FOR YOURSELF.

Thank you for your hard work. As always, if you have questions, please call Robert White (334) 242-4337, or Adam Bourne (334) 242-7202 if you have a legal question.

# EXHIBIT

# E

BATCH

April 25, 2005 Version, <u>AMENDED</u>

(This version supersedes the current 6/24/1996 version)

# INFORMATION EXCHANGE AGREEMENT

# BETWEEN

# (STATE NAME AND NAME OF Motor Vehicle Association (MVA))

# AND

# THE SOCIAL SECURITY ADMINISTRATION

## <u>ARTICLE I</u>
## <u>PURPOSE AND GENERAL BACKGROUND OF AGREEMENT</u>

The purpose of this Agreement is to establish the terms, conditions, and safeguards under which the Social Security Administration (SSA) will provide Social Security Number (SSN) verifications to the (State Name and Name of MVA) (hereinafter referred to as the MVA).

Under the national policy established by section 205(c)(2)(C)(i) of the Social Security Act (the Act)(42 U.S.C. § 405(c)(2)(C)(i)), States are authorized to use the SSN in the administration of their drivers' license laws for the purpose of establishing the identity of individuals affected by such laws, and may require any individual affected by such laws to furnish to the States (or any agency having administrative responsibility for such laws) his or her SSN.

As set forth herein, SSA will provide the MVA with SSN verification service via the batch process for individuals seeking drivers' licenses and identification cards from the MVA. The MVA will transmit to SSA the name, gender, date of birth and SSN for each verification request. The result is a "match"/"no match" response and the reason for the "no match." This verification service will assist the MVA efforts to determine whether the identification information presented to the MVA by individuals seeking drivers' licenses and identification cards is correct.

The MVA acknowledges that SSA's positive verification of an SSN only establishes that the submitted information matches the information contained in SSA records, subject to the tolerances established in SSA's matching routines. The verification does not authenticate the identity of the individual or conclusively prove that the individual submitting the information is who he or she claims to be. As described herein, SSN verification does not constitute a matching program as defined by the Privacy Act, 5 U.S.C. § 552a(a)(8). SSN verification is not used to determine entitlement or eligibility of, or continuing compliance with statutory and regulatory requirements by, applicants for, recipients or beneficiaries of, participants in or providers of

service with respect to cash or in kind assistance or payments under federal benefit programs, or recouping payments or delinquent debts under such federal benefit programs. However, this Agreement is executed under all of the other relevant portions of the Privacy Act of 1974, as amended, and the regulations and guidance promulgated thereunder.

## ARTICLE II
## PERIOD OF AGREEMENT

**The duration of this Agreement is 5 years, effective April 25, 2005 and will expire April 24, 2010. Parties to this Agreement may execute a new Agreement prior to the expiration date so that ongoing services are not disrupted.** The terms of this Agreement are effective upon the signature of both parties and the related and subsequent reimbursable agreements, whichever occurs later. This Agreement does not authorize SSA to incur obligations through the performance of the services described herein. Performance of such services is authorized only by execution of Form SSA-1235-U5. Moreover, SSA may incur obligations by performing services under this Agreement only on a full or partial fiscal year (between October 1 and September 30) basis. Accordingly, attached to, and made a part of this Agreement, is an executed Form SSA-1235-U5 that provides the authorization for SSA to perform services under this Agreement in fiscal year 2006 (or insert the first fiscal year that is applicable to this Agreement). Since SSA's performance under this Agreement spans multiple fiscal years, SSA will prepare a new Form SSA-1235-U5 prior to the beginning of each succeeding fiscal year during which SSA will incur obligations through the performance of the services described herein. Such Form will be signed by the parties before the commencement of the fiscal year and identify reimbursable cost estimates. SSA's ability to perform work for fiscal years beyond FY 2006 is subject to the availability of funds. Additionally, SSA must receive advance payment "in full" prior to the start of the fiscal year in which verification services are requested before SSA provides services to the MVA.

**The Form SSA-1235-U5, including the Conditions of Agreement appended thereto, is incorporated herein by reference. To the extent any inconsistency exists between the terms of this Agreement and the Conditions of Agreement appended to the Form SSA-1235-U5, the terms of this Agreement take precedence and control the relationship between SSA and the MVA.**

## ARTICLE III
## MODIFICATION OR CANCELLATION PROVISION

Either party may request modification to this Agreement at any time. Such a request must be in writing. Concurrence with a request for modification should be made within a reasonable time period. Any modifications to this Agreement must be agreed to by both parties in writing. Written notification of failure to reach agreement on a written request for modification constitutes notice of intent to cancel the Agreement, unless the requesting party withdraws the request for modification.

Either party may unilaterally terminate this Agreement by notifying the other party in writing of its intent to cancel the Agreement at the expiration of 30 days from the date of the notice or a longer period specified in the notice. The parties may confer during the period specified in the notice of intent to cancel for the purpose of resolving differences and reaching an agreement acceptable to both parties. Disputes may be referred jointly to the SSA Deputy Commissioner for Disability and Income Security Programs and the MVA official signing this Agreement for resolution. If the parties are able to resolve the dispute, the notice of intent to cancel will be withdrawn. If the dispute cannot be resolved, cancellation will be effective at the expiration of the period specified in the notice or such later period upon which the parties mutually agree.

However, SSA may make an immediate, unilateral termination of this Agreement if SSA has determined that there has been an: 1) unauthorized use of the verification service by the MVA ; 2) a violation of, or a failure to follow, the terms of this Agreement; or, 3) non payment to SSA in accordance with the parties reimbursable agreement. SSA may make an immediate, unilateral suspension of this Agreement if SSA suspects that the MVA breached the terms for security of data until such time as SSA makes a definite determination regarding a breach.

## ARTICLE IV
## LEGAL AUTHORITY

Authority for this Agreement is found in section 205 of the Social Security Act (42 U.S.C. § 405);
5 U.S.C. § 552a(b)(3); and section 1106 of the Social Security Act (42 U.S.C. § 1306).

Section 205(c)(2)(C)(i) of the Social Security Act (42 U.S.C. § 405(c)(2)(C)(i)) authorizes the States to use SSNs in administering their drivers' license laws by requiring any individual affected by such laws to furnish to the States, or any agency having administrative responsibility for such laws, his/her SSN.

SSA maintains a system of records named "Master Files of Social Security Number Holders and SSN Applications" SSA/OEEAS, 60-0058 (referred to as the "Numident"). Routine use number 34 gives SSA authority to verify personal identification data (e.g., name, SSN, and date of birth) concerning individuals who apply for, or are issued, drivers' licenses or other identification documents by state motor vehicle agencies that issue such licenses or documents (60 F.R. 16155, March 29, 1995). In performing such "verification," SSA may indicate whether the identifying data furnished by the MVA concerning an individual match or do not match data maintained in this system of records, and SSA may identify the particular data elements that do not match. SSA will not disclose information from this system of records which does not match the information furnished by the MVA.

3

## ARTICLE V
## FUNCTIONS TO BE PERFORMED

The MVA agrees to provide to SSA the name, gender, date of birth, and SSN furnished by each person about whom SSN verification service is requested.

SSA agrees to compare the information furnished by the MVA with information in SSA's Master File of Social Security Number Holders system of records. SSA will provide the MVA with SSN verification via magnetic tape, the File Transfer Management System, or other mutually agreed upon transport mechanism. SSA will respond to the MVA with one of the following response codes:

> Blank = Input SSN verified on name, DOB, and gender code
>
> 1 = SSN not in file (impossible SSN/never issued to anyone, OR NO SSN found if all 000's submitted)
> 2 = Name and DOB match, gender code does not
> 3 = Name and gender code match, DOB does not
> 4 = Name matches, gender code and DOB do not
> 5 = Name does not match, DOB and gender code not checked
> **Y/N = Y if death data is present; N if death data is not present**

Note: Death Information will be available **beginning in March 2006.**

The MVA agrees to limit their input file to one (1) file per day and no more than 250,000 records per file. The MVA will annotate its computer system when an SSN has been verified. This will help prevent unnecessary verifications of the same record.

## ARTICLE VI
## REFERRAL OF INDIVIDUALS TO SSA

If the SSN given by the individual does not match SSA's records, the MVA should take the following steps before referring individual to the SSA field office:

1. The MVA should recheck their records to be sure that the original submission data has not changed; e.g., last name recently changed.

2. The MVA will recontact the individual to verify the data submitted is accurate.

3. The MVA will consult with the SSA Project Coordinator to discuss options before any mass mailing occurs advising individuals to contact their SSA field office for resolution.

4

Note: Issuance of new or replacement Social Security card usually takes two weeks.

## ARTICLE VII
## TECHNICAL SECURITY PROCEDURES

A.   SSA and the MVA will safeguard information provided under this Agreement as follows:

1.   Each party shall establish appropriate administrative, technical, and physical safeguards to assure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained.

2.   Access to the records exchanged and to any records created by the data exchange will be restricted to only those authorized employees and officials who need it to perform their official duties in connection with the uses of the information authorized in this Agreement.

3.   The records exchanged and any records created by the data exchange will be stored in an area that is physically safe.

4.   The records exchanged and any records created by the data exchange will be processed under the immediate supervision and control of authorized personnel in a manner which will protect the confidentiality of the records, and in such a manner that unauthorized persons cannot retrieve any such records by means of computer, remote terminal or other means.

5.   The records will be transported under appropriate safeguards.

6.   All personnel who will have access to the records exchanged and to any records created by the data exchange will be advised of the confidential nature of the information and the civil and criminal sanctions for noncompliance contained in the applicable Federal laws.

B.   SSA and the MVA may make onsite inspections or make other provisions to ensure that adequate safeguards are being maintained under this Agreement by both agencies.

C.   SSA and the MVA also will adopt policies and procedures to ensure that information contained in their respective records and obtained from each other shall be used solely as provided under this Agreement and any applicable laws.

5

D.  Compliance with SSA's Information Systems Security Guidelines:

   1.  Data and Communications Security

       The MVA will utilize data encryption and dedicated communication
       circuits whenever SSN and/or SSN related information is transmitted for
       intrastate communication among MVA locations.  If the public Internet is
       used for intrastate communication among MVA locations that include
       SSN information, all electronic communications must, at minimum, utilize
       Secure Socket Layer (SSL) and 128 bit encryption protocols, or more
       secure methods.

   2.  Audit Trail Records

       For audit tracking purposes, the MVA must have in place a mechanism
       that can be used to identify the driver's license or other authorized purpose
       that results in an SSN verification request being submitted to SSA by the
       MVA.  The MVA also must have in place an audit trail mechanism for
       identifying the MVA users who can access/view verified SSN information
       resident in the MVA system subsequent to verification by SSA.

   3.  Integrity of the MVA System

       The MVA must assure that all attempts to verify name and SSN
       information with SSA are recorded, and that no person with access to the
       MVA system can delete or otherwise manipulate a driver's license record
       that was initiated for the purpose of obtaining an SSN verification from
       SSA.  For situations where an SSN fails to verify, the MVA will establish
       a process to retain both the initial failed verification request(s) and the
       final, corrected SSN record.  The MVA must retain SSN verification audit
       trail records for a period of at least three years following the date of SSA's
       reply to the requested SSN verification.

   4.  SSA Onsite Inspections

       SSA reserves the right to make reasonable onsite inspections or other
       provisions to ensure the information system security safeguards described
       above are being maintained by the MVA.  SSA will provide advance
       notice to the MVA at least 24 hours prior to initiation of an onsite
       inspection.  The MVA will make policies and provisions to ensure that
       SSA information used in the SSN verification process shall be used solely
       as provided in this Agreement.

6

## ARTICLE VIII
## RECORDS USAGE, DUPLICATION, AND REDISCLOSURE RESTRICTIONS

A.    Each party agrees to the following limitations on the access to, and disclosure and use of, the electronic files/magnetic tapes (i.e. data) provided by the other agency:

    1.    That the data provided as part of the data exchange will remain the property of the providing agency and will be destroyed or returned after the matching program is completed, but not more than 6 months after receipt of the data.

    2.    That the data supplied by each agency and the records created by the data exchange will be used only for the purposes of, and to the extent necessary in the administration of, the data exchange covered by this Agreement.

    3.    That the data provided by each agency will not be used to extract information concerning individuals therein for any purpose not specified in this Agreement.

    4.    That the data provided by each agency will not be duplicated or disseminated within or outside the agency without the written authority of the agency which furnished the data unless the disclosures are in compliance with the Federal Privacy Act (5 U.S.C. § 552a) and other applicable federal laws and regulations. No agency shall give such permission unless the redisclosure is required by law or essential to the conduct of the matching program. In such cases, the agency redisclosing the records must specify in writing what records are being redisclosed, to whom they are being redisclosed, and the reasons that justify such redisclosure.

B.    Neither SSA nor the MVA will provide remote terminal access to the files exchanged under the terms of this Agreement.

## ARTICLE IX
## OTHER CONDITIONS

Certain Federal laws specifically govern the collection, and restrict the use and disclosure of, SSNs by the MVA. Examples of these laws are section 7 of the Privacy Act of 1974 (5 U.S.C. § 552a note) and 42 U.S.C. § 405(c)(2)(C). The MVA agrees to collect and disclose SSNs in accordance with these laws.

7

The MVA agrees to use the verification services provided by SSA under this Agreement only for purposes of establishing the identities of applicants for, and holders of, drivers' licenses and identification cards issued by the MVA.

SSN verification services are being provided under the terms of this Agreement with the understanding that the MVA will not use the fact of SSN verification as an enhancement to any information marketing efforts conducted by the State or its agents. If any such marketing effort occurs, termination of this Agreement under Article III will be considered.

## ARTICLE X
## INITIATING THE VERIFICATION SERVICE

Initiating the SSN verification service requires a completed Agreement, SSA-1235 and payment in full before the process begins.

For service in a subsequent fiscal year SSA and the MVA will execute a separate reimbursable agreement (SSA-1235-U5) and payment will be made by the MVA prior to services being rendered.

While a reimbursable agreement (SSA-1235-U5) is required for each fiscal year (October through September), this Agreement **or any amendment to this Agreement** is in existence until **the expiration date in Article II.**

## ARTICLE XI
## REIMBURSEMENT

The reimbursement cost estimate is based on the volume of SSNs, as well as any associated personnel costs.

At the end of each quarter, SSA will provide the MVA a "Statement of Account" which will show the amount of the advance, expenses incurred, and current balance. If at any time it is determined that actual costs will exceed the estimate by 10 percent or $1,000, whichever is greater, the SSA Regional Office (RO) project coordinator must initiate an amended reimbursable agreement form which increases the estimated amount of the original reimbursable agreement form or terminate the project to prevent SSA from having to absorb the cost overruns.

SSA will prepare a final billing at the end of each fiscal year. If a balance is due to SSA, the MVA will immediately remit the balance due or service will be terminated. If a balance is due the MVA at the end of the fiscal year, SSA will reimburse the MVA promptly.

For any amounts past due, the Debt Collection Act, the Federal Claims Collection Act, and 45 CFR Part 30 require that interest, administrative costs, and penalties be charged if debts are not paid within thirty days of the mailing of the first notice. SSA will use the "Private Consumer Rates of Interest" developed by the Treasury and applied against the overdue payment.

## Accounting Information

SSA
EIN : 52-6004813

MVA
EIN: 63-0695764

SSA
Office of Finance
P.O.Box 17042
2-B-4 ELR
Baltimore, Md. 21235
(410) 965-0555
Attn: Collections Operations
    Branch Team Leader

MVA
Department of Public Safety
Financial Services
301 S. Ripley Street
Montgomery, Alabama 36104
(334) 353-9896
ATTN: Fran Copeland

Project Coordinators

SSA
(Name)
(Address)
(Office Location)
(Phone)

MVA
Curt Terling
ATTN: Jamie McGregor
301 S. Ripley Street
Montgomery, Alabama 36104
(334) 242-4424
(334) 242-0713 Fax

9

## ARTICLE XII
## SIGNATURES

The signatories below warrant and represent that they have the competent authority on behalf of their respective agencies to enter into the obligations set forth in this Agreement.

**Social Security Administration**

**APPROVED BY:**

_____      _____

(Name)                                                        Date
Regional Commissioner

**(State Name and Name of the MVA)**

**APPROVED BY:**

_W. M. Coppage_ _____      _5/8/06_____

Colonel W. M. Coppage                          Date
Director
Alabama Department of Public Safety

**APPROVED AS TO FORM:**

_____

Legal Counsel
Alabama Department of Public Safety

10

SOCIAL SECURITY ADMINISTRATION

# AGREEMENT COVERING REIMBURSABLE SERVICES

JOB NUMBER: **R491**    EIN Number:  52-6004813                CAN Number:

## REQUESTING ORGANIZATION

| | BEGINNING AND ENDING DATES |
|---|---|
| NAME<br>Alabama Department of Public Safety (DPS) | 10/01/2005 through 09/30/2006 |

ADDRESS
301 South Ripley
Montgomery, AL 36102-

## TYPE OF SERVICE REQUESTED

PROJECT TITLE OR KIND OF SERVICES
SSN Verification Service for:

BRIEF EXPLANATION:  **EXAMPLE – Use the Enumeration Verification Service (EVS) to verify Social Security numbers (SSNs) used by the Florida Department of Highway Safety and Motor Vehicles only for purposes of establishing the identities of applicants for, and holders of, driver's licenses and identification documents issued by the Florida Department of Highway Safety and Motor Vehicles.**

Authority is found in section 205 of the Social Security Act (42 U.S.C. § 405); 5 U.S.C. § 552a(b)(3); and section 1106 of the Social Security Act (42 U.S.C. § 1306).

REFERENCES TO CORRESPONDENCE ON THIS MATTER (copies attached)

## SSA PROJECT COORDINATOR

| NAME | OFFICE |
|---|---|
| **Paul Barnes** | SSA, Office of the Regional Commissioner, Atlanta Ga |

## SSA CONTACT FOR INFORMATION PERTAINING TO THIS AGREEMENT

| NAME | OFFICE |
|---|---|
| | SSA, 2001 12 Avenue North, Birmingham Al 35285 |

## ESTIMATED COST AND FINANCING OF SERVICES

| ESTIMATED COST OF SERVICES *(Full cost is to be billed as work is completed)* | FINANCING *(Advance Payment Required Before Work Begins)*<br>☐   TOTAL PROJECT |
|---|---|
| $2,630.11 | ☐ |

## SSA AUTHORIZATION

| SSA AUTHORIZING OFFICIAL  **(RC signs here)** | DATE |
|---|---|

## ACCEPTANCE - FOR USE OF REQUESTING ORGANIZATION

Please provide the services requested above.  We agree to pay you the full cost of such services in the amount or amounts to be determined by you prior to any work being performed; and we agree also to all of the terms and conditions stated on the reverse of this form.

| NAME - ORGANIZATION'S PROJECT COORDINATOR | TITLE | |
|---|---|---|
| SIGNATURE OF AUTHORIZING OFFICIAL | TITLE | DATE |

**Form SSA-1235-U5**

# CONDITIONS OF AGREEMENT

1.  The authority to compile and furnish information to the requesting organization and receive reimbursement for the cost thereof, is contained in Section 601 of the Economy Act (47 Stat. 417), Section 1106 of the Social Security Act (42 U.S.C. 1306), Regulation No. 1 of the Social Security Administration (20 CFR 401.1 et seq.) and the Office of Management and Budget Circular A-34 (Revised November 7, 1997). Moreover, furnishing this information is consistent with the provisions of the Privacy Act and the Freedom of Information Act, as amended. In addition, Section 2207 of the Omnibus Reconciliation Act of 1981 (P.L. 97-35) and Section 1106 of the Social Security Act authorize SSA to recover the full costs, notwithstanding the fee limitations under the Privacy Act or Freedom of Information Act.

2.  For agreements that span more than one fiscal year (October 1 through September 30), SSA's ability to provide service in the subsequent fiscal year is subject to the availability of funds. Should obligational authority not be available, thus requiring SSA to terminate work under the agreement, the requestor agrees to reimburse SSA for its full costs incurred through the period for which funds were available to SSA.

3.  An advance payment is required before SSA will begin work on a project as follows:

    a.  **Non-Federal** requestors are required to provide an advance payment equal to 100 percent of the Social Security Administration's estimated costs. When the project is completed, these requestors will receive either a refund of any unused advance balance or be billed for any additional costs. Interest will not be paid by SSA on the unused advance balance.

    b.  **Federal** agency requestors are required to provide an advance payment equal to 50 percent of the Social Security Administration's estimated costs. The Social Security Administration will collect the initial advance and subsequent reimbursements through the Treasury Department's On-Line Payment and Collection System (OPAC).

4.  Full costs (direct and indirect) incurred will be offset either monthly or quarterly against advances received. Any additional costs not covered by an advance will be billed immediately. The Debt Collection Act, the Federal Claims Collection Act, and 45 CFR 30 require that interest, administrative costs and penalties be charged if debts are not paid within 30 days from the mailing of a first notice. This is the Social Security Administration" policy except where prohibited or expressly provided for by law. The interest charge will be at a rate developed by Treasury for the most recent 3 month period and applied against the overdue payment for each 30 day period or portion thereof that the payment is delayed. It is understood that the requesting organization will be billed for and will pay the full costs notwithstanding the estimated costs.

5.  The Social Security Administration will not be held accountable for any errors in such information, whether such errors occur in compilation of such information or in the data from which the compilation is made. All information furnished will be subject to the limitations and qualifications, if any, transmitted with such information. If, because of any error, such information must be recompiled or refurnished, or both, the cost thereof will be treated as a part of the full costs incurred in compiling and furnishing such information to be paid by the requesting organization.

6.  Requests for information, identifying a Social Security number holder, are to be submitted on forms furnished by the requesting organization and each request must be signed and dated by the Social Security number holder or must be accompanied by a signed and dated authorization of the Social Security number holder. An authorization must be presented within 60 days after its execution. Where the Social Security number holder is deceased, the form or authorization must be signed by his survivor or the legal representative of his estate. A signature by mark must be witnessed by two disinterested persons; i.e., individuals not connected with the requesting organization, and the signatures of the witnesses must be written and their addresses shown. Improperly completed requests; e.g., those not received within 60 days from the date of the individual's signature, will be returned without processing.

7.  It is agreed by the requesting organization that any identifiable information furnished to them under this agreement will be made available to the individual concerned upon his request.

8.  The requesting organization and/or the Social Security Administration may terminate this agreement, in whole or in part, by giving a 60 day advance written notice. All costs incurred prior to the termination date will be paid by the requesting organization.

9.  If the requesting organization fails to pay any costs not entirely covered by an advance, payment within 15 days of billing, the Social Security Administration will stop processing/furnishing information until the delinquent bill is paid in full.

# EXHIBIT

# F

STATE OF ALABAMA DEPARTMENT OF

# PUBLIC HEALTH

Donald E. Williamson, MD
State Health Officer

June 20, 2006

The Honorable Nancy L. Worley
Secretary of State of Alabama
P. O. Box 5616
Montgomery, AL 36103

Dear Secretary Worley:

The Attorney General's Office has provided the Department of Public Health with a copy of the recent declaratory judgment and preliminary injunction issued in U.S. v. Alabama, directing your office to establish a computerized voter database. The Department will be happy to cooperate with this endeavor. Our Center for Health Statistics(CHS) is prepared to provide an electronic copy of death records for persons over 18 so that they may be linked to the computerized database.

The electronic records would be sorted by county of residence and have the same fields as the paper records we are currently providing under a 1990 Memorandum of Understanding: name of the deceased, date of birth, date of death, social security number, sex, race, county of residence, and zip code of residence. There are currently two options for electronic transmission. First, CHS could provide either a .txt or PDF version of the records to be downloaded through a secure FTP site on a weekly basis. This method is used to transmit records to the Jefferson County Voter Registrar. Second, CHS could use the secure network to send the records directly to the Secretary of State mainframe. This system is used to provide records to other state agencies, including the Administrative Office of Courts, the Alabama Medicaid Agency, and the Criminal Justice Information System.

As the voter registration database is developed, the Department will be happy to work with the Office of the Secretary of State to facilitate sending the required records on a regular basis using any reasonable protocol. Please contact Dorothy Harshbarger, State Registrar of Vital Records, at (334) 206-5426 to make further arrangements.

Sincerely,

Donald E. Williamson, M.D.
State Health Officer

cc: Winfield J. Sinclair, Assistant Attorney General
    Misty S. Fairbanks, Assistant Attorney General
    Dorothy Harshbarger, State Registrar of Vital Records

The RSA Tower • 201 Monroe Street • Montgomery, AL  36104
P.O. Box 303017 • Montgomery, AL  36130-3017



## ADMINISTRATIVE OFFICE OF COURTS
300 Dexter Avenue
Montgomery, Alabama 36104-3741
(334) 954-5000

Drayton Nabers, Jr.
Chief Justice

Randy Helms
Administrative Director of Courts

June 28, 2006

Honorable Nancy Worley
Secretary of State
State of Alabama
State Capitol
Montgomery, Alabama 36104

Re:  Helping Americans Vote Act (HAVA)

Dear Secretary Worley:

On behalf of the Administrative Office of Courts (AOC), we are honored to join you in your efforts to ensure the integrity of the voting system in the state of Alabama through compliance with the Helping Americans Vote Act (HAVA). We offer our full cooperation with your office and full compliance with all applicable HAVA federal regulations and court orders in this very important project and specifically,  section 303(a)(2)(A)(ii)(I) of HAVA  which provides that the "State shall coordinate the computerized [voter registration] list with State agency records on felony status .

Please direct all correspondence in this regard to my attention. I will look forward to hearing from your office soon.

Sincerely,

Lynne R. Thrower
Legal Counsel

c:  Win Sinclair
    Misty Fairbanks

# EXHIBIT

# G

*ALABAMA ASSOCIATION*
*of*
*BOARDS of REGISTRARS*
*123 North Broadnax Street*
*Dadeville, Alabama 36853*

**June 27, 2006**

Honorable Nancy Worley
Alabama Secretary of State
State Capitol Room S-102
Montgomery, AL 36130

Dear Madam Secretary,

Regarding Judge Watkins' *Memorandum and Order* and your request for "comments about this order or suggestions for the plan", the Legislative Committee of our Association has polled the individual Boards of Registrars throughout Alabama and we are forwarding their remarks for inclusion in your plan. Our comments will follow the paragraph order from pages 5 and 6 of Judge Watkins' order (atch 1).

Page 5,

Para (1)

- When a new RFP is initiated the State Finance Director and the Chief Information Officer should, in cooperation with the Secretary of State, take the lead in determining hardware and software acquisitions to meet HAVA compliancy.
- Computer equipment in registrars offices should be up-to-date, internet capable (3 work stations/county where needed) with printer capability adequate to meet the range of voter populations in our State. Large counties will require software interface architecture that will allow the State database to print directly to hi-speed equipment owned or maintained by the counties.
- As end users and defendants, Registrars should be given greater opportunity to contribute to the selection process.

**Para (2)**

    - The new system must reside on a state main frame whether within ISD or the Secretary's existing equipment. This does not preclude contracts with public vendors as needed for software applications that are not available through the State.

**Para (3)**

    - The Law Enforcement Tactical System (LETS) may provide an opportunity to access the required information for cross verification.

    - Peripheral to this issue is concern about the legitimacy of mail-in and hand delivered (under-the-door) applications that come to our offices. Since HAVA requires some sort of identification at the polls and for absentee voting, Registrars request similar criteria for "absentee" voter registration.

**Para (4)**

    - No Comment

**Para (5)**

    - No Comment

**Para (6)**

    - Covered in Para (3) Peripheral......     - Amend the Driver's license section of the registration application to state "You *must* send with this application .... (list the same ID's as are acceptable at the polls or for absentee voting).

**Para (7)**

    - At all cost, retain the architecture that compares name, identity number (driver's license, last four or assigned number), and date of birth of a newly registered voter with the state data base. This triggers a message to other counties in the event that a potential duplicate situation needs review.

The single greatest concern voiced by registrars revolved around the identity issue. Driver's license number and last four of SSN are an improvement although full SSN is viewed as essential, Federal legislation notwithstanding. There was overwhelming sentiment that some identification be included with mail-in or voter drive applications (sometimes found "under-the-door"), to include the name and address of the person soliciting the applicant.

Most felt "left out" in past system/equipment/capability procurement processes i.e.:
- managed in secrecy, no significant registrar input
- Three groups of registrars offered an opportunity so late in the process that it appeared a decision had been made and we were being "set up" to ratify the inevitable

Page 18, Para 3.3.3 (atch 2) of your proposed plan appears to insure that Boards of Registrars, the end users of any proposed new system and defendants in Judge Watkins' order, will again have no say regarding "the business outcomes and functional requirements of the system, along with overall State goals, such as rapid development and implementation, expedited completion, and **MINIMIZATION OF DISRUPTION** (*emphasis added*).

Madam Secretary, the registrars want to help you achieve HAVA compliance. We intend to be part of the solution *not part of the problem.* We respectfully request that you take our comments seriously, allow us to participate substantively in the system selection process and together we can build a HAVA compliant registration system for our State.

To that end, we are already working in committee to review the PLAN in greater detail with an eye to a more complete and productive package in advance of the July 20 hearings.

Respectfully,

Robin Foster, President                                Lester Sellers, Chmn
                                                       Legislative Committee


Cy to: Attorney General                    2 attachments
       Appointing Board                        1. Watkins' order, pp 5&6
       Advisory Board                          2. PLAN page 18
       HAVA Committee

declaratory relief statute are broad. *See Gant v. Grand Lodge of Texas*, 12 F.3d 998, 1001 (10th Cir. 1993).

The Court has considered the evidence presented by the United States and finds that the record is more than adequate to support the findings and relief sought. The Court finds that the State of Alabama has not had in the past and currently does not have a computerized statewide voter registration system that meets the requirements of Section 303 of HAVA. More specifically:

(1) The State has not implemented a single, uniform, official, centralized, interactive computerized statewide voter registration list that is defined, maintained, and administered at the State level and that contains the name, registration information, and unique voter identification number of every legally registered voter in the State;

(2) The State does not have a computerized statewide voter registration list that serves as the single system for storing and managing the official list of registered voters throughout the State;

(3) The State does not have a computerized statewide voter registration list that has been coordinated with other agency databases within the State or the Social Security Administration;

(4) The State does not have a computerized statewide voter registration list that serves as the official voter registration list for the conduct of all elections for federal office in the State;

(5) The State does not coordinate with State agencies keeping records on deaths, felon status, and federal Social Security records for the purpose of removing ineligible voters or verifying eligible voters;

(6) The State does not have data verification procedures for first-time registrants by mail after January 1, 2003, nor does it collect the required information to be able to implement data-matching verification for all new registrants after January 1, 2006; and

5

(7) The State does not maintain an interactive computerized statewide voter registration list that ensures that the name of each registered voter appears on the list, that only voters who are not registered or who are not eligible to vote are removed from the list, and that duplicative names are eliminated from the list on an expedited basis.

The Court further finds that the Secretary of State of Alabama, the chief elections officer responsible for developing, maintaining, and implementing the State's voting systems and voter registration lists, and respective agency heads responsible for providing information for the computerized statewide voter registration list, have failed to take the actions necessary for the State to meet the requirements of Section 303 of HAVA in a timely manner. These failures include, but are not limited to, the following: (1) the Secretary of State has not contracted with an entity or entities to develop and implement a statewide voter registration list; (2) the Secretary of State and the heads of the agencies responsible for database verification and updates have not established the technical requirements or built the technical infrastructure necessary for implementation of the statewide voter registration list; and (3) the Secretary of State and the State have not entered into an agreement with the Social Security Administration and established the necessary infrastructure to match information from the statewide voter registration list against the Social Security number database. The Court further finds that, even with all due diligence, a minimum of nine months will pass before the State is compliant with HAVA.

6

# DRAFT          DRAFT          DRAFT

submitted).   The Secretary of State will spend no more than two additional weeks making this determination.


3.3.3 The five proposals of the finalists will then be submitted to the Voter Registration Advisory Board ("Board"), the President of the Alabama Probate Judges' Association ("Association"), and the HAVA Committee ("Committee") for input and advice.  The Board, the Association, and the Committee will have no more than two weeks to offer comments. The chairs of the respective entities will be responsible for calling any meetings to discuss the proposals.  The Secretary of State will be responsible for making the final selection after she considers input offered by the Board, Association, and the Committee.  Once she has selected a vendor, the state will enter into contract negotiations with the chosen vendor.


3.3.4 The contract will largely mirror the new RFP and will incorporate any relevant order(s) from the Court and all relevant state and federal law.  Technical details will be left to the selected vendor.  The contract will allow a maximum of ten months for project completion.


18

*atch 2*



# ST. CLAIR COUNTY BOARD OF REGISTRARS



P.O. Box 488
ASHVILLE, ALABAMA 35953
TELEPHONE (205) 594-2126
FAX (205) 594-2110

SHELIA WILLIAMS
JUNE DIXON

BUEL H. PLEMONS
Chairperson

June 27, 2006

The Honorable Nancy Worley
Secretary of State
Alabama State Capitol
600 Dexter Avenue, Suite S-105
Montgomery, Alabama 36130

Dear Secretary Worley,

In hurriedly reviewing the draft plan we have noticed a few items we would like to ask your consideration in making a final decision for the plan and requirements.

3.3.3   Review of the final proposals of the finalists seems to include everyone except Registrars. It seems logical that the vast experience of many Registrars who will be at the implementation level and who know first hand the current problems and experience the daily short comings with current voter registration, should also be considered in obtaining an effective system.

3.4.3   We would hope that in requiring Registrars to periodically attest to the validity and accuracy of information entered consideration will be given to the fact that for many items entered, Registrars must rely on the voter to provide accurate information. Many times phone confirmations are not possible. Entering the required information in an accurate and timely manner as prescribed should not be a problem.

In the RFP, Page 5 of 26, III. PROJECT SCOPE AND OVERVIEW.
    A. (last sentence) The word _interactive_ (two way) access carries the connotation that each probate judge's office and each circuit clerk's office could both enter and retrieve information from the voter file. The new system should limit changes to be made only by authorized registrars.

Thank you for allowing our review and input.

Sincerely,

Buel H. Plemons
Chairman

OFFICERS

HON. STANLEY BATEMON
PRESIDENT
ST. CLAIR COUNTY

HON. RHONDEL RHONE
FIRST VICE PRESIDENT
CLARKE COUNTY

HON. JEROLD DEAN
SECOND VICE PRESIDENT
CONECUH COUNTY

O.H. SHARPLESS
EXECUTIVE DIRECTOR

OFFICE

100 NORTH JACKSON STREET
MONTGOMERY, ALABAMA 36104
PHONE (334) 263-7594
FAX (334) 263-7678
WWW.ACCA-ONLINE.ORG



## ASSOCIATION OF COUNTY COMMISSIONS OF ALABAMA

A Nonprofit Corporation

### TRANSMITTED BY FACSIMILE

# MEMORANDUM

**TO:**      Nancy L. Worley, Secretary of State
             Winfield J. Sinclair, Assistant Attorney General
             Misty Fairbanks, Assistant Attorney General

**FROM:**    Mary E. Pons, Staff Attorney
             Association of County Commissions of Alabama

**DATE:**    June 27, 2006

**RE:**      Secretary of State's Draft Plan for Interconnected Voter
             Registration Database

In response to the June 23, 2006 Memorandum from the Attorney General's Office providing the opportunity to comment on the above-referenced draft plan, intended to be filed on June 28, 2006 in United States v. State of Alabama, Case Number 2:02-CV-00392-WKW-SRW, the Association of County Commissions of Alabama (ACCA) submits the following for consideration by the Secretary of State and the office of the Attorney General. The ACCA appreciates the Attorney General's office providing this opportunity to review and comment on this draft plan on behalf of Alabama county commissions, and the Attorney General's continued efforts to keep this office apprised of developments in this case. We ask that you continue to include the ACCA in all correspondence and to keep us informed of developments.

There are several areas of concern which, due to the time restraints for response, are set out below in general terms only. However, the ACCA would be happy to discuss any or all of these concerns in more detail prior to or following submission of the plan to the Court. Additionally, the ACCA reserves the right to raise further or different concerns in the future, and may at some point, request to be heard by the Court.

### 1.    Discussion of County Officials

The ACCA takes issue with the several references to "county officials" as an impediment to the timely implementation of a statewide voter registration and maintenance system. The implementation of these HAVA requirements is

clearly, under state and federal law, the responsibility of the Secretary of State as
the state's chief elections official. While it is acknowledged that some counties
still have a local system in place, it is reported that this is in large measure due
to the deficiencies in the ALVIN system and its inability to accommodate certain
local needs in the preparation of voter lists for local elections, etc, and is not in
resistance to an adequate statewide system. Moreover, the statewide system is
required to be implemented by the Secretary of State regardless of whether other
systems exist.

There is also concern that the reference is to "county official" in general,
without identifying which officials have purportedly hampered the Secretary of
State's ability to meet her statutory obligations. The term "county official" is
quite broad, and would include county commissioners, probate judges, sheriffs,
and tax officials. The county commission really plays no role in the
establishment and maintenance of voter registration lists. Therefore, any
intended reference to the county commission is inappropriate.

It is also important to note that members of the Board of Registrars are *not*
county officials. Code of Alabama 1975, § 17-4-158(c) provides clearly that the
registrars are state employees, and they perform state, not county, functions.
Under these circumstances, any stated or intended references to the role or
performance of registrars in the election process and development and
implementation of a statewide system should clearly identify these individuals as
state, not county, employees performing a state, not county, function.

## 2. Rulemaking Authority

The ACCA is greatly concerned about the language in the proposal
regarding the Secretary of State's rulemaking authority and plans for
promulgating rules to govern the maintenance of voter lists for the November
2006 general election and for development of the new system.

It is acknowledged that the Secretary of State has rulemaking authority
under Alabama's general law. However, this authority is not unlimited, and
must be conducted in compliance with the procedures set out in Alabama's
Administrative Procedures Act. No state official has authority to bypass
Alabama law in promulgating rules and regulations or to promulgate rules and
regulations in areas beyond the authority granted to him or her by Alabama's
Legislature. It appears that the Secretary of State intends to ask the court to
expand this authority, and perhaps direct her to promulgate rules in areas not
currently authorized by law. Any attempt to promulgate rules and regulations
beyond her statutory authority and/or addressed to entities or officials not
under her supervision will likely be vigorously challenged as necessary.

Additionally, there is concern that the Secretary of State intends to seek
permission from the court to bypass the statutory procedures set out in the
Administrative Procedures Act, and to waive statutory time frames for notice,
comment, and adoption of administrative rules. Code of Alabama 1975, § 41-22-

5 provides a process for promulgating emergency rules, which the Secretary of State can and perhaps should invoke in order to implement necessary rules and regulations as soon as possible. However, there should be nothing included in the plan or in a request to the court for extraordinary authority to make administrative rules effective in a manner not contemplated in Alabama law. In fact, because of the serious impact that any administrative rules or regulations will have on the roles of other entities involved in the voter registration and maintenance process, the Secretary of State should be required to take extraordinary steps to ensure that proper notice of the intent to promulgate rules is received by all affected or interested entities, and that there is adequate and meaningful opportunity to comment on all proposed rules.

## 3. Development and Review of Requests for Proposals

The Secretary of State's proposed plan states that she will prepare and evaluate requests for proposals "in conjunction with technology experts from the business, government, and education sectors". It is evident from the circumstances giving rise to this lawsuit that it is imperative to have participation from *all* stakeholders at *all* levels of the development and implementation of a statewide system. Therefore, the Secretary of State's plan should state with specificity that both the development of the request for proposals and the evaluation of any proposals received include representatives from each entity which will play a role in the creation and maintenance of an adequate and compliant statewide system. It is recommended that a stakeholder's committee be involved in every level of development and implementation, which committee should include, but not be limited to representatives from each of the following groups or entities: probate judges, boards of registrars, circuit clerks, county commissioners, Attorney General's office, Administrative Office of Courts, Information Systems Department, Department of Public Safety, and any other state or local entity required to interface with the system or provide information or duties in the development or maintenance of the voter registration list.

## 4. Costs of Voter Registration and Maintenance System

The development, implementation, and maintenance of a statewide voter registration and maintenance system are state responsibilities and all aspects of the system must be funded with federal and/or state monies. The ACCA will monitor the progress of the lawsuit, implementation of the Secretary of State's plan, and promulgation of any rules and regulations to ensure that there is no effort to require county government to assume any costs associated with the statewide system, except as specifically required under existing Alabama law. While county government supports all efforts to bring Alabama into full compliance with all provisions of HAVA, counties do not have any legal responsibility to share in the costs associated with implementation and maintenance of a statewide voter registration system, and will vehemently oppose any efforts to require county government assumption of any such costs.



KIMBERLY A. MELTON
CHIEF CLERK

# PATRICIA YEAGER FUHRMEISTER

### JUDGE OF PROBATE • SHELBY COUNTY
### P.O. BOX 825
### COLUMBIANA, ALABAMA 35051

TELEPHONE
205-669-3713

June 27, 2006

Hon. Nancy Worley
Secretary of State
State of Alabama
State Capitol
600 Dexter Avenue
Montgomery, Alabama 36130

Dear Secretary Worley:

This letter is in response to your requested input relative to a possible court mandated plan for a statewide centralized voter registration list. Shelby County understands fully the requirement for a centralized voters' list, and we do not oppose efforts for its establishment. However, we do have concerns relative to our ability to use ALVIN as a centralized list, and we have concerns about the form any new system may take.

It appears that your proposed plan includes provisions allowing counties with independent voter registration systems to use those systems in the November, 2006, General Election. We appreciate that recommendation, but are cognizant that the United States may object and/or that the Court may not approve your plan. We feel it necessary to make you and the Court aware that the use of ALVIN would be disastrous in Shelby County.

ALVIN has a number of shortfalls which we do not believe can be adequately addressed before the November election. Some particulars, (based on information obtained from our IT personnel), follow:

1) ALVIN does not automatically assign voters with the correct precinct and political subdivision designations based on the entry of voter name and address. Our present system does, and that feature is particularly important due to the fact that Shelby County is dissected by nine legislative districts, nine commission districts and two state board of education districts. If the Board of Registrars is required to manually enter the precinct and district information for each voter, it will not only require an excessive amount of time, it will likely result in a much higher error rate;

Hon. Nancy Worley
Page 2
June 27, 2006

2) ALVIN cannot automatically assign voters with a ballot style based on the voter's combination of political subdivision attributes;

3) ALVIN is not available during all voting hours, and, in fact, is unavailable, at least temporarily, during the peak voting hour of 5:00 p.m.;

4) There is no field in the ALVIN system for state board of education districts. Many counties are wholly contained within one district; however, Shelby is split between the two districts, as are some individual precincts. Our county system makes an automatic assignment of state board of education district, based on address point, and ballot styles are based on that and other variables.

5) We are accustomed to generating electronic reports as needed, sometimes very quickly. We understand that, utilizing ALVIN, we would not be able to generate electronic reports, but would be dependent on an employee at the state level to e-mail them to us.

This is by no means a comprehensive list of concerns relative to the use of ALVIN for the November election, but, due to time constraints, we submit it as representative of anticipated problems.

As regards the implementation of a new system for all elections following November, 2006, please keep in mind that any county could be required to hold a special election prior to the implementation of the new system. While we would not anticipate that such an election would involve a federal office or issue, we would need the ability to use our county system until such time as a new system is implemented.

We would request that the requirements for any new system take into account the specific needs of individual counties. For instance, Shelby County has a number of fire districts, a library district and several zoning districts. The voters' lists for elections relating to those districts are derived by inputting the lines of the districts' physical boundaries and assigning voters a designation based on address point. For zoning elections, the petition process requires us to merge our voter list information with property assessment information. This is clearly an attribute that ALVIN lacks and which any new system may lack unless it is made a requirement. Any new system should also provide for the automatic assignment of precinct/political subdivision information based on address point. The system should be able to accept our line and mapping work in order to create lists as needed for all purposes. And, of course, we would hope that the new system would allow a seamless transfer of our present information without the need for manual reentry. Again, this is not a comprehensive list, but is, by way of explanation, a summation of why we believe county input is vital in the design of the system's requirements.

Hon. Nancy Worley
Page 2
June 27, 2006

Finally, we have concerns about the extent to which Administrative Rulemaking has been proposed as a substitute for matters which might require legislative action, provisions regarding "discipline" of Registrars by the Secretary of State, and the request for Court ordered access to local systems. Our voter registration information is stored and maintained with that of other county departments, and, while we do not object to providing information and/or working with the State to satisfy compliance concerns, we would not wish to compromise the security of our county's sensitive data.

We appreciate the opportunity to comment, and look forward to discussing these matters further. Thank you.

Sincerely,

Patricia Yeager Fuhrmeister
Probate Judge

Lindsey J. Allison
Chair, Shelby County Commission

Mark Dillard
Chair, Shelby County Board of Registrars

Alex Dudchock
County Manager

Cc:  Frank C. Ellis, Jr., Esq.
     Dorman Walker, Esq.
     Jack Park, Esq.
     Winfield J. Sinclair, Esq.
     Misty S. Fairbanks, Esq.



# PATRICIA YEAGER FUHRMEISTER

### JUDGE OF PROBATE • SHELBY COUNTY
### P.O. BOX 825
### COLUMBIANA, ALABAMA 35051

KIMBERLY A. MELTON
CHIEF CLERK

June 28, 2006

TELEPHONE
205-669-3712

Hon. Nancy Worley
Secretary of State
State Capitol
600 Dexter Avenue
Montgomery, Alabama 36130

Dear Secretary Worley:

It has come to my attention that, in Shelby County's recent letter to you commenting on the proposed voter registration plan, we neglected to relay our concerns relative to a proposed moratorium on the purchase or implementation of new local registration systems. Shelby County is in the process of developing a comprehensive elections application which will allow us to administer elections more easily and will allow us to communicate important information to voters more effectively. A part of that overall plan includes a new voter registration platform which is more compatible with those which store other county data.

As I mentioned in my previous letter, one of the uses Shelby County makes of its registration list is to merge it with a list of property ownership assessments. This creates a list which allows me to perform the required petition verification process when zoning beat petitions, municipal incorporation/annexation petitions, etc., are filed. We need to maintain the ability to perform that and other functions, even if we use a new, centralized list for the actual elections.

Let me reiterate that we fully understand HAVA's requirements for a centralized voter registration list, and this should not be construed as opposition to such a list; however, we do not believe that a moratorium on county purchases should be a component of the Court's order.

Thank you.

Sincerely,

Patricia Yeager Fuhrmeister
Probate Judge

Lindsey J. Allison
Chair, Shelby County Commission

Hon. Nancy Worley
Page 2
June 28, 2006

Marti Dillard
Chair, Shelby County Board of Registrars

Alex Dudchock
County Manager

cc:    Frank C. Ellis, Jr., Esq.
       J. Dorman Walker, Jr., Esq.
       Jack Park, Esq.
       Winfield J. Sinclair, Esq.
       Misty S. Fairbanks, Esq.

**Bourne, Adam**

| | |
|---|---|
| **From:** | Worley, Nancy |
| **Sent:** | Wednesday, June 28, 2006 12:20 AM |
| **To:** | Bourne, Adam |
| **Subject:** | FW: Question for Secretary Worley |

FYI

-----Original Message-----
From: pjmagik@bellsouth.net [mailto:pjmagik@bellsouth.net]
Sent: Tuesday, June 27, 2006 3:29 PM
To: sos@sos.al.gov
Subject: Question for Secretary Worley


I wonder why the voter registration form was changed, regarding the change from SS number
to driver's license number. (I had thought the state could use either number or a
designation number of their makeing but that is not what this note is about. I wonder
since we are changeing the form we are not updateing it in accordance to an Attorney
General's opinion as below &quot;

Honorable Don Davis
Mobile County Probate Judge
109 Government Street
Post Office Box Seven
Mobile, Alabama 36601

Probate Judges - Mental Health - Incompetents - Registrars, Board of - Uniform
Guardianship and Protective Proceedings Act

A person who is determined to be an "incapacitated person" does not automatically lose the
right to vote. Only persons who have been declared mentally incompetent to vote are
disqualified from voting and must therefore be reported to the board of registrars in
accordance with section 17-4-131 of the Code of Alabama.

Dear Judge Davis:

        This opinion of the Attorney General is issued in response to your request.


QUESTIONS

        1. Under section 17-4-131 of the Code of Alabama, is the term "mentally
incompetent" synonymous to "mentally incapacitated" as that term is defined in the Alabama
Uniform Guardianship and Protective Proceedings Act?

        2. Under section 17-4-131 of the Code of Alabama, is the judge of probate required
to provide a list of all adults over the age of 18, who have been declared mentally
incapacitated under the Alabama Uniform Guardianship and Protective Proceedings Act, to
the board of registrars?


FACTS AND ANALYSIS

        Section 177 of article VIII of the Recompiled Constitution of Alabama, as amended,
provides that no person who is mentally incompetent shall be qualified to vote until that
disability has been removed. ALA. CONST. art. VIII, § 177 (amend. 579). To facilitate
that prohibition, section 17-4-131 of the Code of Alabama requires the probate judge,
monthly, to provide the board of registrars with "a list of all residents of the county,
18 years of age or over, who have been declared mentally incompetent." ALA. CODE §
17-4-131 (1995) (emphasis added). The board of registrars utilizes this information to
purge, from the registration list, the names of those people who are registered to vote
but who have been declared mentally incompetent. ALA. CODE § 17-4-132 (1995). As your

1

request notes, Alabama law does not define "mentally incompetent." You ask whether, for purposes of section 17-4-131, the phrase "mentally incompetent" is synonymous with the phrase "mentally incapacitated."

The fundamental rule of construction is to ascertain and give effect to the intent of the Legislature in enacting the statute. Ex parte Ala. Dept. of Mental Health and Mental Retardation, 840 So. 2d 863, 867 (Ala. 2002); Gholston v. State, 620 So. 2d 719, 721 (Ala. 1993). In construction of statutes, legislative intent may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained. Bama Budweiser v. Anheuser-Busch, 611 So. 2d 238, 248 (Ala. 1992); Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n of Tuscaloosa County, 589 So. 2d 687, 689 (Ala. 1991); Shelton v. Wright, 439 So. 2d 55, 57 (Ala. 1983).

The Alabama Uniform Guardianship and Protective Proceedings Act defines "incapacitated person" as follows:

Any person who is impaired by reason of mental illness, mental deficiency, physical illness or disability, physical or mental infirmities accompanying advanced age, chronic use of drugs, chronic intoxication, or other cause (except minority) to the extent of lacking sufficient understanding or capacity to make or communicate responsible decisions.

ALA. CODE § 26-2A-20(8) (1992). Although Alabama law does not define "mentally incompetent," Black's Law Dictionary defines "incompetence" as "the state or fact of being unqualified or unable to do something." BLACK'S LAW DICTIONARY 768 (7th ed. 1999).

In recognition of the variety among incapacitated persons, the Alabama Legislature, in 1987, revised Alabama's guardianship statutes to allow for a "limited guardianship" concept. 1987 Ala. Acts No. 87-590, 975. Section 26-2A-105 provides, in part, as follows:

(a) The court shall exercise the authority conferred in this division so as to encourage the development of maximum self-reliance and independence of the incapacitated person and make appointive and other orders only to the extent necessitated by the incapacitated person's mental and adaptive limitations or other conditions warranting the procedure.

. . . .

(c) The court . . . may limit the powers of a guardian otherwise conferred by this chapter and thereby create a limited guardianship. . . .

ALA. CODE § 26-2A-105 (1992). The comments to this section explain that the purpose of these provisions is "to remind an appointing court that a guardianship under this legislation should not confer more authority over the person of the ward than appears necessary to alleviate the problems caused by the ward's incapacity." ALA. CODE § 26-2A-105 comments (1992). In addition, the comments to section 26-2A-1 state that "rather than permitting an all-or-none status, there should be an intermediate status available to the courts through which the protected person will have personal liberties and prerogatives restricted only to the extent necessary under the circumstances." ALA. CODE § 26-2A-1 comments (1992). Accordingly, the phrase "incapacitated person" applies to persons with a range of capacity levels and does not necessarily apply to those who are incompetent to vote.

This Office has previously stated that persons who are mentally incapacitated vary in their capacities. Opinion to Cletus N. Youmans, Judge of Probate, dated May 21, 1993, A.G. No. 93-00182. Even if a person has a guardian or a conservator, this does not automatically deem the person incompetent to vote. Id. at 5.

It remains the opinion of this Office that a person who is determined to be an "incapacitated person" does not automatically lose the right to vote. As this Office has stated, the "safest and fairest course for probate judges is to address, during the course of guardianship/conservatorship proceedings, the issue of whether the individual is competent to vote." Youmans at 7. Only persons who have been declared mentally incompetent to vote are disqualified from voting and must therefore be reported to the board of registrars in accordance with section 17-4-131 of the Code.

CONCLUSION

A person who is determined to be an "incapacitated person" does not automatically lose the right to vote.  Only persons who have been declared mentally incompetent to vote are disqualified from voting and must therefore be reported to the board of registrars in accordance with section 17-4-131 of the Code.

I hope this opinion answers your questions.  If this Office can be of further assistance, please contact Rushing Payne of my staff.

Sincerely,

TROY KING
Attorney General
By:


BRENDA F. SMITH
Chief, Opinions Division

TK/WRP
181013v1/72859
The change would be to have &quot;i have not been judged &quot;mentally incompetent&quot;
TO VOTE in a court of law and &quot;have not been declared mentally incompetant TO VOTE in a court of law.

please let mw know why this was not addressed.

pj

----- Correspondent's Information -----

Name:  Ms. pj magik
E-mail:  pjmagik@bellsouth.net
Daytime phone number:  205-387-0159

------- Mailing Address -------
Business Name (if applicable):
Address Line 1: 68 boyer road
Address Line 2:
Address Line 3: jasper, AL 35503

Correspondence directed to: Secretary Worley (sos@sos.al.gov) Type of correspondence:
Question

-- Technical Specifications --
Originating IP Address: 74.226.4.250
Operating System: WinNT
Web Browser: MSIE
Browser Version:  6.0

------------ end of info ------------



# JEFFERSON COUNTY COMMISSION

**OFFICE OF COUNTY ATTORNEY**

EDWIN A. STRICKLAND
County Attorney

CHARLES S. WAGNER
JEFFREY M. SEWELL
THEODORE A. LAWSON, II
Assistant County Attorneys

280 Courthouse
Birmingham, Alabama 35203
Telephone (205) 325-5688
FAX (205) 325-5640

June 28, 2006

<u>(BY FACSIMILE 334-242-2444 AND US MAIL)</u>
The Honorable Nancy Worley
Office of Secretary of State of Alabama
600 Dexter Avenue, Suite S-105
Montgomery, Alabama 36130

Re:  State of Alabama's Proposed Plan for the
Establishment and Implementation of a Statewide
Voter Registration System that is Compliant with HAVA

Dear Secretary Worley:

We represent Jefferson County Registrar Nell Hunter and Jefferson County, Alabama. We have reviewed the State of Alabama's proposed plan for the establishment and implementation of a statewide voter registration system that is HAVA compliant and offer the following observations regarding the interim plan:

1.  We have no comments regarding pages 3 through 12, paragraph 3.1.1.

2.  With regard to paragraph 3.2.1, we suggest that the Secretary of State reserve numbers 1 through 1,000,000 for Jefferson County voters. That will eliminate potential confusion of Jefferson County voters with those of other counties.

3.  We have no comment regarding paragraph 3.2.2.

4.  With regard to paragraph 3.2.3, we note that Jefferson County contains approximately 400,000 or twenty percent of the state's registered voters. Requiring Jefferson County to conduct elections with the existing state list will cause the following problems:

A.  Some voters will be provided the wrong ballot. That is unavoidable because the existing state voter list does not contain ballot numbers that correspond with Jefferson County ballot styles. We have many precincts where multiple ballots are used.

The Honorable Nancy Worley
June 28, 2006
Page Two

For example, in the November, 2006, general election there will be 186 polling places and up to 8 ballots in use at a single polling place. Poll workers at those precincts cannot determine from the state list which ballot should be provided to which voter. Providing the wrong ballot will disenfranchise voters, generate litigation in close elections and likely result in excessive use of provisional ballots.

      B.    Poll workers will be required to manually perform the voter update function for every person who votes. The County voter list contains a bar code identification of every registered voter. Immediately following an election the bar codes of every person that votes are nearly instantaneously scanned and the voter update function is completed. The existing state list does not contain a bar code. Therefore, a manual update will have to be performed for each person who voted. In an election with a fifty percent turnout 200,000 manual updates would be required.

      C.    There will be substantial delays for voters. Jefferson County's software permits the county voter list to be split in up to 8 alphabetical sub-lists (i.e. A-D; E-H; I-M; etc.) with defined break points so that eight lines of voters can move simultaneously through the process. There is no way for Jefferson County to divide the existing state voter list with defined break points. That will result in a single line at each polling place which will cause substantial delays and likely discourage voters from voting.

      D.    Poll workers will have difficulty determining which voters must complete a voter update form. The County voter list is further split into active and inactive lists. Poll workers are trained to require all voters whose name appears on the inactive list to complete a voter update form before voting. There is no way for Jefferson County to divide the existing state voter list in that manner. Instead, the state list contains the letter "i" before the name of an inactive voter. If the poll worker misses that letter "i", the voter update form will not be completed.

      To avoid these results we suggest that the language of paragraph 3.2.3 be changed to indicate that all local officials will begin using the official statewide voter registration system as soon as it is operational. That will allow Jefferson County to continue to use its own list until the state can provide a list that will avoid these problems.

      5.    With regard to paragraph 3.2.4, we suggest that the words "24 hours" be replaced with the words "business day" and that the word "upload" be changed to "transmit".

      6.    With regard to paragraph 3.2.5, we recommend that the word "upload" be changed to the word "transmit" and that the word "biweekly" be changed to "every two weeks".

The Honorable Nancy Worley
June 28, 2006
Page Three


7.    Jefferson County does not operate a dual entry system. Accordingly, we have no comment regarding paragraph 3.2.6.

8.    With regard to paragraph 3.2.7, we suggest that the last sentence be deleted. There is no need to build a temporary interface between Alvin and Jefferson County when an electronic data exchange can confirm that the two data bases contain identical information.

9.    With regard to paragraph 3.2.8, we suggest that the words "24 hours" be replaced with the words "business day".

With respect to your long term plan, we concur that the state needs to contract for the goods and services necessary to comply with HAVA and recommend that the state follow its competitive bid law. We will work with you and the vendor you select to achieve HAVA compliance.

Sincerely,

Jeffrey M. Sewell
Assistant County Attorney


JMS/khc


cc:    Winfield Sinclair
       Misty Fairbanks

# EXHIBIT

# H

## ESTIMATED PLAN TIMELINE

**The following is an estimated Plan timeline which assumes an August 1, 2006 Court Order.**

**The timeline represents the minimum time needed to complete the Plan requirements and objectives. It will only be fully implemented by the February 2008 Presidential Preference Primary if the Legislative Contract Review Committee does not hold the vendor contract for review for 45 days. However, to err on the side of caution, the timeline assumes that the Committee will delay the contract.**

**Any necessary administrative rules under the Plan can be filed on an emergency basis and will therefore be in place by the various federal elections described in the Plan.**

- **August 1, 2006**         **Court Order**

- **August 15, 2006**       **Vendor Letters**

- **September 12, 2006**    **RFP Issued**

- **October 27, 2006**      **Vendor Proposals Due**

- **December 8, 2006**      **Technical Review of Proposals**

- **December 22, 2006**    **Outside Input on Proposals**

- **January 21, 2007**      **SOS Selects Vendor**

- **April 21, 2007**        **Vendor Contract Negotiated**

- **May 3, 2007**           **Contract Review Committee Meets**[1]

- **June 17, 2007**        **Contract Review Complete**

- **February/March 2008**   **New System Complete**

---

[1] The Legislative Contract Review Committee has not yet issued a 2007 meeting schedule. However, the Committee typically meets on the first Thursday of each month.