IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action Number |
| v. | ) | |
| | ) | 2:06-CV-00392-WKW-SRW |
| STATE OF ALABAMA, and | ) | |
| NANCY L. WORLEY, | ) | |
| Alabama Secretary of State, | ) | |
| in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

DEFENDANTS' REPLY TO PLAINTIFF'S RESPONSE
TO DEFENDANTS'SUBMISSION OF HAVA PLAN (Doc. 31)

Come now Defendants State of Alabama and Nancy L. Worley, in her

official capacity as Alabama Secretary of State, by and through Troy King,

Attorney General for the State of Alabama, and submit their reply to the Plaintiff's

Response to Defendants Submission of HAVA Plan (Doc. 31) (hereinafter

"Plaintiff's Response").

INTRODUCTION

The United States brought this lawsuit contending that Alabama was not in

compliance with the Help America Vote Act of 2002 ("HAVA") and seeking as

relief that the defendants be ordered to submit a plan within 30 days to bring the

State into HAVA compliance (*see* Doc 1, Complaint; *see* Evidentiary Submission at

Exhibit 1, DOJ Press Release dated May 1, 2006).  After the defendants candidly represented that the State is not in full HAVA compliance and stated that the relevant issue was how best to bring the State into full HAVA compliance (*see* Doc. 8, Defendants' Response to Motion for Preliminary Injunction), the plaintiff changed the relief it was seeking.  It did so by submitting a letter (with attachments) to the Court in which it sought to dictate the contents of the State's to-be-developed plan in accordance with a purported consent agreement with California and in which it sought to shorten the defendants' plan submission time to 15 days.[1]

At the show cause hearing, the Court, encouraged by the plaintiff's letter submission (see, e.g. May 30, 2006 Transcript at 32-33) (hereinafter "Tr."), began to craft the HAVA compliance plan rather than simply directing the defendants to submit a HAVA compliance plan and thereafter determine what modifications should be made.  In addition, the Court "encourage[d] the parties to begin promptly negotiations" with an eye towards arriving at a consent decree (Tr. at 40).

On June 7, 2006, the Court entered its Memorandum and Order Granting Declaratory Judgment and Preliminary Injunction (hereinafter "Preliminary

---

[1]     Ordinarily at this point in the pleading there would be a record reference. However, while the defendants responded in opposition to the Justice Department letter (Doc. 13, Defendants' Response to Plaintiff's May 24, 2006 Letter) and the Court used the letter and the attachments while fashioning its preliminary injunction (see Doc. 26, May 30, 2006 Hearing Transcript, at pp. 8-9; 32-33), the Court did not make the letter or attachments part of the record.  The defendants' motion to make the letter and attachments a part of the record (Doc. 21, Defendants' Motion to Supplement the Record) was denied (Doc.  23, June 29, 2006 Order).

Injunction") in which the defendants were ordered to "develop promptly a HAVA compliance plan." (Preliminary Injunction, at 9). Among the many specific requirements for the plan, one was that the plan contain "[a]n interim plan to bring the State's existing voter registration system (ALVIN) into the greatest possible degree of compliance with the requirements of HAVA by the November 2006 elections for Federal office" (Preliminary Injunction, at 9). Another one of the requirements was that a large number of officials were "to develop promptly a HAVA compliance plan." (Preliminary Injunction, at 9). The Secretary was ordered to forward a copy of the preliminary injunction to each registrar and, in the Secretary's discretion, to probate judges and county governing bodies (Preliminary Injunction, at 9).

The Secretary, as the State's Chief Election Official, Ala. Code § 17-1-8(a), crafted the State's HAVA compliance plan. A draft plan was put on the Secretary's web site on Friday, June 23, 2006, and input on the draft plan was sought from a variety of sources, including the plaintiff (who declined to participate) prior to the filing of the final plan with the court (*see* Doc. 22, Submission of HAVA Plan, Analysis, and Argument, with Exhibit 1, HAVA plan at 2-3 at n.2) (hereinafter "HAVA submission"). On June 29, 2006, the defendants filed the HAVA compliance plan (HAVA submission, with Exhibit 1, HAVA plan).

On July 13, 2006, the plaintiff filed their objections to the plan (Doc. 31, Plaintiff's Response to Defendants' Submission of HAVA Plan). The plaintiff contends that the HAVA plan is not "realistic" and

> . . . requests (1) that the Court direct Defendants to submit an adequate plan within two weeks, which would, *inter alia*, describe how the State would bring its existing "ALVIN" database into substantial compliance with the HAVA for the 2006 federal primary [sic], expedite a long-term plan that would become fully operational no later than June 2007, and arrange for all maintenance and data transfer to occur well prior to Alabama's 2008 federal primary elections; (2) in the alternative, that the Court direct the appointment of a special master to assist with and direct the implementation of an appropriate plan; or (3) in the alternative, that the Court direct Defendants to proceed pursuant to a schedule delineated herein by Plaintiffs and set frequent status conferences so that their progress man be closely monitored.

(Plaintiff's Response at 1-2).

The defendants respond to the plaintiff's contentions in detail below. For purposes of this Reply, the defendants will speak of the November 2006 General Election, but it is important to keep in mind that the true deadline is not in November. By statute and by necessity, many election-related processes start before then, *e.g.,* printing ballots and absentee voting.

4

**The November 2006 Election**

*"Moving the Goalposts"*

The plaintiff's demand concerning the 2006 General Election is in marked contrast to its statements during the preliminary injunction hearing. At that hearing counsel for the plaintiff made the following statements:

- " . . . I believe that the Department concluded that a fully HAVA-compliant new database was extremely unlikely to be implemented by November." (Tr. at 28).

- "The short answer, Your Honor, is that the November elections will not be what we would call HAVA-compliant. And with respect to full HAVA compliance, what we're concerned about is the 2008 primary and general. And we don't want there to be any pressure in that regard." (Tr. 29).

- "[W]e would be willing to listen to any suggestion as to how the existing ALVIN system could be brought into as much compliance with HAVA as is possible by November. That's all that we're seeking." (Tr. 28-29).

And finally, when the Court said, "[b]ut there is nothing that you're saying has to be accomplished before the November general election other than the overall getting a vendor and getting started with becoming compliant, get through the

election, and then get everyone in line and marching under one order," the

plaintiff's counsel answered "I agree, Your Honor." (Tr. 29).

Now, the plaintiff has shifted gears, demanding that ALVIN be brought into

"substantial compliance with HAVA for the 2006 federal primary [sic]", (Plaintiff's

Opposition at 1; *see also id.* at 3-8) and, possibly, that ALVIN be used statewide in

November. (The Plaintiff's Response is not clear on this point.)

### *The Secretary's Plan for November 2006*

The Secretary's HAVA plan to bring the existing voter registration system

"into the greatest possible degree of compliance" with HAVA for the November

2006 election is very limited, but the Secretary submitted that it is unrealistic to do

more without risking the integrity of the election.[2]   As outlined above, it is also

consistent with the defendant's understanding of the plaintiff's position at the show

cause hearing.

The Secretary's plan consists of using HAVA compliant registration forms,

some revised ALVIN codes and revised daily update procedures. The revised voter

registration forms were only precleared by the Department of Justice on July 14,

---

[2]      The plaintiff avers that the HAVA plan submission is actually an untimely Rule 59(e)
motion to reconsider (Plaintiff's Response at 7). The defendants disagree. Rule 59(e) is
irrelevant because the Preliminary Injunction is "subject to revision at any time prior to entry of
judgment" with the meaning of Fed. R. Civ. P. 54. Rule 59 is crafted to apply to final judgments.
 *Cf.  The Hertz Corp. v. Alamo Rent-A-Car, Inc.*, 16 F. 3d 1126 (11th Cir. 1994) ("The strictures
of Rule 59(e) remain dormant, however, until a final judgment has been entered.").

2006  (Evidentiary Submission, at Exhibit 2, Department of Justice letter dated July

14, 2006).  The plaintiff has yet to take a formal position on whether the revised

forms are HAVA compliant.

The defendants respectfully request that the plaintiff make its position known

at the July 20th hearing.[3]  If the forms are HAVA compliant, then the defendants can

continue to move forward with printing and distributing the forms.  If the plaintiff

contends that the forms are not HAVA compliant, the plaintiff should say so at the

earliest possible time.  The defendants will then stop the lengthy printing process

and make the changes required by the court.  The plaintiff should commit to

facilitating expedited preclearance of the once-again revised forms if the forms are

to be printed and distributed in time to be of value for the 2006 General Election.

### Factors Affecting the Practicability of Changes for the 2006 General Election

As noted in the HAVA submission, Shelby County and Jefferson County

have represented that they cannot run the election off of ALVIN and that, if they

tried, there is a very real chance of election chaos (HAVA Submission at Exhibit 1,

at Exhibit G).  While the plaintiff elects to challenge the credibility of the Secretary

based upon statements made in an unsworn document, without representation, and

---

[3]     This is not too soon.  The plaintiff has had the revised voter registration forms in its possession for more than a month, and the defendants' counsel have previously asked the plaintiff for its position on the HAVA compliance of the form.

by a person who admits she has "limited technological understanding" (Tr. 26), the

plaintiff never disputes the positions of Shelby County and Jefferson County that

they cannot run the 2006 election off of ALVIN without jeopardizing their

elections. Indeed, the plaintiff's filing appears to be indifferent to the prospect of a

meltdown in the November 2006 elections (see Plaintiff's Response generally).

Since the filing of the plan, the State has undertaken to solicit additional

feedback from Probate Judges, the chief election officials of the counties, Ala. Code

§ 17-1-8(b), as to whether they now plan to run the November 2006 elections using

ALVIN and whether they could do so (Evidentiary Submission at Exhibit 3, July 6,

2006 Fax to Probate Judges). The responses, from 59 of the 67 Alabama Counties,

are included in Exhibit 5 (Evidentiary Submission at Exhibit 5, Probate Judges'

Responses to July 6, 2006 facsimile) and summarized in Exhibit 4 of the

Evidentiary Submission (Evidentiary Submission at Exhibit 4).[4] About half the

counties that responded said that they use ALVIN and will use ALVIN in

November. (*See id.*) The other half who responded indicated that they would have

various problems trying to use ALVIN in November. (*See id.*)

---

[4] These responses are not altogether consistent with the information provided in Exhibit B
to the Secretary's plan. (HAVA Submission at Exhibit 1, at Exhibit B). Exhibit B apparently
lists counties as using ALVIN if they merely have ALVIN equipment, irrespective of whether
they use it. The probate judges' responses also are not entirely consistent with other records of
the Secretary's Office, which should not be entirely unexpected given the number of Alabama
counties, the diverse ways local officials manage their elections, and changing circumstances.

Shelby County and Jefferson County have already written letters outlining

some of the problems that they anticipate facing if they are ordered to run the

November 2006 election off of ALVIN.  Those letters were included with the

HAVA plan (see HAVA Submission at Exhibit 1, at Exhibit G).  Mobile County

has now provided a similar letter as well (Evidentiary Submission at Exhibit 6,

Mobile County letter dated July 13, 2006).  Following are a few of the insights

offered by other counties:

- "1> ALVIN takes 6 to 8 hours to run precinct poll list for election 2> <u>ANY BREAK DOWN</u> while printing[] requires restart of printing - multiple that scenario time[s] 67 counties." (Evidentiary Submission at Exhibit 5, at Chambers County fax response).

- "It is our experience that the Fayette County Data contain[ed] in ALVIN is totally inaccurate. This is in[]spite of our weekly updates and repeated efforts to align the two systems. Fayette County number of registered voters per ALVIN: approximately 22,000 Fayette County number of registered voters per Fayette County system: approximately 11,500. This is the real number. As you can see, we  have zero confidence in ALVIN[.]" (Evidentiary Submission at Exhibit 5, at Fayette County fax response).

- "1.    To get the polling list from Alvin, the county had to travel to Montgomery.  The information is time sensitive for Election Day plus the additional cost of travel and personnel costs charged against the county.  The style and format are not consistent with the procedures for polling place officials in our county. 2.    The Probate Judge is required to certify polling list with no ability to verify information.

3.      The Alvin equipment is antiquated and shuts down routinely to bring daytime system down and nighttime system up during this process, polls are open with no access to the computer list.

4.      Alvin access is slow when time is limited in furnishing information to election officials, slowing voting process.

5.      Currently using an excellent computerized system, what took weeks to post voter history now takes only days."

(Evidentiary Submission at Exhibit 5, at Houston County fax response).

- "The use of ALVIN **_only_** has the potential to cause total chaos in the election process in Limestone County for the following two important reasons: (a) ALVIN does not have the ability to assign ballot styles for registered voters subject to political subdivisions.  (b)  ALVIN does not have the ability for the probate judge to produce a poll list for each voting location in Limestone County."  (Evidentiary Submission at Exhibit 5, at Limestone County fax response).

- "1.      It could take two weeks to run the poll list with the equipment we currently have.

2.      We do not have enough ALVIN equipment to support our staff.  We only have one ALVIN terminal.

3.      If we were to need technical support on election day, we see no way it can be provided in a timely manner."

(Evidentiary Submission at Exhibit 5, at Madison County fax response).

- "There are two main problems if Morgan County used only ALVIN.  (1) The printer is totally inadequate for the volume of printing required to print the lists.  The local list is maintained on the local AS400 and printed on a high-speed printer.  Even on the high-speed printer it is a lengthy print time due to the volume.  (2)  The local list and printing of such has the capability to print which ballot style each voter is to be issued, and this added feature is not an option from ALVIN.  Unless printed for the Election Officials the task of correctly issuing the proper ballot style would be insurmountable."

(Evidentiary Submission at Exhibit 5, at Morgan County fax response).

- "In the years that Alvin has been in operation, it has never worked properly. If we have to use Alvin, I will seriously consider resigning." (Evidentiary Submission at Exhibit 5, at Pickens County fax response).

- ▪ "Talladega County has a State School Board split and Alvin cannot accommodate us with this.  Years ago when we used Alvin only we experienced not being able to get our list when needed." (Evidentiary Submission at Exhibit 5, at Talladega County fax response).

- ▪ "Our board of registrars does not have the means to print a poll list.  The board of registrars has to go to Montgomery to pick up the list.  Alvin is not adequate to print the list for all 67 counties at the same time."  (Evidentiary Submission at Exhibit 5, at Walker County fax response).

Witnesses are expected at the July 20, 2006 hearing to testify, if necessary, that it is unrealistic to try to impose ALVIN on non-ALVIN counties for the November 2006 General Election.

### *Addressing the Plaintiff's Contentions*

The plaintiff challenges the credibility of the Secretary of State based upon her previous representations to the plaintiff's representatives that Alabama was substantially compliant and that certain computer interfaces could be done "quickly."  It does so because, in the words of the plaintiff, the defendants now "denounce the ALVIN system they had previously described as 'substantially compliant,' and submit statements from Shelby County and Jefferson County officials discussing the insurmountable defects with the present system and explaining why it cannot be used to run the 2006 general election." (Plaintiff's

Response at 5, citing Defendants' HAVA Plan Submission at 7-9).   There are a number of flaws with the plaintiff's contention.

First, the plaintiff does not recognize the substantial differences between the documents at issue.  One is the Secretary's formal plan to come into full compliance with HAVA, subject to pain of contempt for any failings.  The other is a letter based upon hearsay conversations between the non-technical Secretary and her technical staff about what could be done with electronic database connections.  The plaintiff's submission in no way indicates what questions the Secretary was asked by the Justice Department representatives, how she related those questions to the technical staff, how the staff understood those questions, or the context of the pertinent conversations.

Second, despite the fact that the Department of Public Safety has now twice signed and submitted agreements sent to it by the Social Security Administration, the Administration has yet to sign the agreement (Doc, 27 at 2-3).  Accordingly, any technical interface involving DPS with respect to social security information is currently premature.

Third, Sheldon Jeames, the creator of ALVIN, has opined that there is not sufficient time create such interfaces before the November 2006 General Election (*see* Evidentiary Submission at Exhibit 7, Declaration of Sheldon Jeames).  The

interfaces cannot simply be added; instead, ALVIN would require a substantial updating and revision to become capable of accepting the interfaces.[5]  Even if all of this could be done before the November 2006 General Election, it is unlikely that it could be done in time to actually lead to the removal of any persons improperly on the voting rolls.  Given that there are already procedures in place for removing the deceased and otherwise ineligible voters (*see* Evidentiary Submission at Exhibit 8, Declaration of Adam L. Bourne), and the fact that the General Election is only three-and-a-half months away, implementation of technical interfaces represents an unproductive use of limited resources.

Fourth, the defendants are not denouncing ALVIN.  It has worked well in those counties that have used it in recent elections.  ALVIN is expected to continue to work well in those counties (*see* Evidentiary Submission at Exhibits 4 and 5, Probate Judges' responses and summary).  However, there is a reason that many counties do not use ALVIN; it does not work for them.  (*see id.*)  The non-ALVIN counties have developed or purchased voter registration systems that meet their needs in ways that ALVIN does not.  These counties should be allowed to continue

---

[5]     If the interfaces cannot be created by state personnel, then the process would have to be the subject of a request for proposal (an "RFP"), which would certainly take more than the time left between now and the election.

using their current voter registration systems until a new and fully HAVA compliant system can be put in place.

Fifth, and most important, the plaintiff in no way disputes the accuracy of the assertions of the county officials that the November 2006 General Election simply cannot be run off of ALVIN in their counties (*see* Plaintiff's Response generally). Perhaps the plaintiff prefers not to hear them.[6]

Whatever the reason for the glaring absence of any rebuttal to these on-the-ground concerns, the plaintiff's focus is instead in arguing that the defendants presented no evidence of its inabilities at the show cause hearing (Plaintiff's Response at 6). The stated purpose of that hearing was for the defendants to show cause why the Secretary should not be directed to develop a plan for HAVA compliance. It was not an evidentiary hearing, and it should have been restricted to the purpose of granting the Secretary 30 days to develop her plan.[7]

---

[6]    Indeed, the plaintiff initially attempted to prevent those county officials from being heard by its initial opposition to the Probate Judges Association's request to comment on the Secretary's HAVA plan (Doc. 25, Plaintiff's Opposition to Alabama Probate Judges Association's Motion to Comment). The plaintiff apparently continues its opposition to local officials' input in this process: "Defendants' plan is inadequate. . . because it seeks comments and reviews from entities that should not be permitted to participate in the process as parties." (Plaintiff's Response at 3).

[7]    That is not how the hearing played out. After the defendants candidly averred HAVA non-compliance in their response to the Motion for Preliminary Injunction, the plaintiff "moved the goalposts" and proceeded to attempt to dictate a HAVA plan. The plaintiff now proposes to again "move the goalposts" and compel the planning and use of technical interfaces that will serve no useful purpose for the November 2006 election. The plaintiff's earlier position, taken at

Moreover, the plaintiff presents no credible evidence to counter the defendants' assertions that the technical interfaces (as well as other items sought by the plaintiff) will constitute an unacceptable risk to the integrity of the November 2006 General Election.

### *Equity and the 2006 General Election*

Even more disconcerting is the plaintiff's apparent indifference to the prospect of an election meltdown in November 2006 (see Plaintiff's Response generally).  The plaintiff does not counter the defendant's invocation of equitable principles in the case at bar.

The federal offices on the ballot (which consist solely of Congressional Representatives) are not expected to be close elections.  Indeed, in the Fifth, Sixth, and Seventh Congressional Districts, the candidate in the General Election does not even have an opponent on the ballot in the November 2006 General Election (*see* HAVA Submission at Exhibit 4, Alabama's Congressional Races).

Based on the responses of the Probate Judges (*see* Evidentiary Submission at Exhibits 4 and 5), and information from the State's Legislative Reapportionment Office (*see* Evidentiary Submission at Exhibit 9, maps of Congressional Districts,

---

the show cause hearing, was that the plaintiff knew that the November 2006 General Election would be HAVA non-complaint, and that the plaintiff was "flexible," open to "suggestions," and primarily concerned about the 2008 elections (Tr. 28-29).

State Legislature Districts, and State Board of Education Districts), the defendants prepared the chart in Exhibit 10 listing the voter registration in use in each county by Congressional Districts (Evidentiary Submission at Exhibit 10, Congressional Races and ALVIN Usage). It is striking that Districts Five, Six, and Seven, where the Congressional Races are currently one-horse races, at least twelve entire counties use voter registration systems other than ALVIN (*Id.*; *see also* HAVA Submission at Exhibit 4, Alabama's Congressional Races). It is striking because the plaintiff argues that ALVIN should be forced upon these twelve counties, though the federal elections are pro forma and the potential problems are extreme. HAVA was not intended to move elections backward.

The plaintiff does not deny that three of the federal elections involve candidates who are unopposed and the other federal elections are not expected to result in close contests. The plaintiff does not deny that a number of state and local elections are expected to result in close contests. The plaintiff does not even deny that Alabama's recent primary and general elections have been conducted with reasonable, prompt, and accurate results. The plaintiff simply reiterates its demands for HAVA compliance with no regard for the prospect of a potentially catastrophic election. The balance of the equities simply does not favor the plaintiff's position for the 2006 General Election.

16

**The 2008 Election**

*Introduction*

The plaintiff argues that the 2008 plan contains "an extraordinarily relaxed timeline" (Plaintiff's Response, at 8). The plaintiff suggests (with no real basis) its own timeline "for a hard operational deadline of June 1, 2007, to reach full compliance with HAVA" (Plaintiff's Response, at 13-19). Let us be clear: Alabama wants to be fully HAVA compliant. Alabama understands that it has failed to come into full compliance through the implementation of a statewide voter registration system. From the first filing in this case, Alabama has admitted its failure to implement such a system and emphasized that the only legitimate goal of this litigation is to find a reasonable and proper means of bringing the State into compliance.

What the State has not done is concede that the harm posited by the plaintiff (*see* Doc. 3, Memorandum of Law in Support of United States' Motion for a Preliminary Injunction at 14-17)exists, or shifted the customary burden off of the plaintiff. The fact that Alabama lacks the voter registration system ordered by HAVA does not mean that Alabama is routinely disenfranchising eligible voters, allowing the dead to vote, allowing the living to vote repeatedly, or otherwise running elections entirely lacking integrity (*cf.* Exhibit 8, Bourne declaration).

17

Likewise, the fact that Alabama has missed the deadline to implement a HAVA-compliant voter registration system does not mean that the State can now implement a system overnight. Nor does it mean that the plaintiff is entitled to make demands that are both unreasonable and unsupported by any facts that would demonstrate they can be achieved. There is no reason to rush this project to completion by June 2007 when the next following federal election will not be until February 2008 or, possibly, June 2008 (*see* HAVA Submission, at 5 & n.4).

### *The Request for Proposals Process*

The plaintiff's biggest criticism is the use of a new RFP, which is a time-consuming process. Plaintiff suggests that a new RFP is unnecessary because the Secretary can use the previous RFP (Plaintiff's Response at 9).[8] The plaintiff assumes that the original three vendors are still available to perform the same services at the same prices. It is true that, at the show cause hearing, defense counsel stated his "understanding" that, although negotiations broke down [with Diebold], the Secretary "[could] go back to the three vendors who were finalists under the last contracting process." (Tr. at 12). That non-committal statement was

---

[8]    It is noteworthy that, while castigating the defendants for not following the Court's preliminary injunction by submitting a plan for implementing technological interfaces that may be impossible and certainly will not be useful, the plaintiff has no problem suggesting that the defendant not comply with that portion of the preliminary injunction that specified a HAVA RFP that contained provisions that are not part of the original RFP (see Preliminary Injunction at 9-10).

made after only an initial consultation with the Secretary and without the benefit of

detailed examination of the RFP or contact with any of the three potential vendors.

These additional steps had not been taken at the time of the show cause hearing

because the defendants understood the hearing would be confined to the relief

initially sought by the plaintiff, *i.e.,* that the defendants would be directed to craft a

HAVA plan within 30 days.   Since the hearing, additional information has been

elicited, and it is now clear that the original RFP is stale (*see e.g.,* Evidentiary

Submission at Exhibit 11, July 17, 2006 letter from SysCon, Inc.).  Such

misunderstandings are inevitable when hearings progress beyond their stated

subjects.

    If this Court directs that a new RFP be issued, the plaintiff suggests that the

RFP contain provisions for the vendor to supply both software and hardware

(Plaintiff's Response at 18).  That would violate Alabama law.  Alabama buys

routinely needed products and some services off a bid list; it issues an invitation to

bid (ITB) for other products and some services; and, finally, the agency in question

may issue a request for proposals (RFP) for professional services.  The provisions

governing RFPs, Ala. Code §§ 41-16-70 *et. seq.*, are relatively new, having become

effective in December of 2001.  The State bid law is codified at Ala. Code §§ 41-

19

16-20 *et. seq.*; a separate bid law for "certain State and local agencies" is codified at Ala. Code §§ 41-16-50 *et. seq.*

In an effort to comply with these laws, the Secretary's plan envisions buying computers and printers from a bid list (*see* HAVA Submission, at Exhibit 1 at 23). Those products should be available there, though the list and, thus, the precise selections change. The Secretary's plan contemplates issuing an ITB to purchase a server (*see id.* at 24). An ITB is proper because, after the selected voter registration system vendor makes its server requirements known, the Secretary will be able to specify exactly what is needed, and the server vendors will respond with their bids. The Secretary will be bound by law to accept the "lowest responsible bidder." Ala. Code § 41-16-20(a). Finally, the Secretary's plan contemplates issuing an RFP for professional services designing and implementing customized voter registration software. (*see* HAVA Submission, at Exhibit 1 at 20-22). Because professional services are involved, the Secretary would be given discretion to select the best fit from among the proposals she receives; she is not required to select the lowest bidder. Ala. Code § 41-16-72(4). But, by the same token, the RFP cannot include the purchase of the computers, printers, or servers that are fungible and required by law to be purchased from the bid list or through an ITB.

Dissatisfied with the proposed timeline, the plaintiff suggests that the Secretary attempt to declare an emergency for purposes of avoiding the contract review committee (Plaintiff's Response, at 17). Not only is the plaintiff's reading of the statute much more broad than the reading of responsible state officials, such a declaration would cause far more problems that it purports to solve.

Next, the plaintiff quotes a newspaper article for its proposition that, since the Secretary is already familiar with the vendors and the proposals, less time needs to be devoted to new proposals (Plaintiff's Response at 10). However, even if those quotations by the newspaper were accurate (there being no evidence one way or the other),[9] they were hardly made in contemplation of being found to be in contempt of court if said deadlines were not met. In addition, the plaintiff assumes that there the vendors and proposals will be the same. The defendants have been informed that some vendors who originally responded to the RFP are no longer interested in the project (Evidentiary Submission at Exhibit 14, communications from vendors). Other vendors who did not respond originally have expressed an interest to the Secretary in being considered. The new potential vendors will need an appropriate

---

[9] The plaintiff confuses admissibility of the evidence for the weight of the evidence. The defendants did not dispute the introduction into evidence of the plaintiff's submissions with its motion for preliminary injunction (since the defendant's stated objective from the outset has been how best to bring Alabama into HAVA compliance). However, the weight of that evidence, the inferences to be made from that evidence, and the impact of that evidence on the development of a HAVA plan, are entirely different matters. Hearsay and second-hand statements are entitled to little or no weight. Inferences are matters of opinion, not hard facts.

amount of time to craft their proposals so that they can have a fair opportunity to present their proposals.

### *Implementing a HAVA-Compliant Voter Registration System*

Turning from the RFP process to the implementation of the voter registration system, the plaintiff contends that no more than six months are needed for this important and complex project.  (Plaintiff's Response at 18).   The reason given is that:

> [t]he vast majority of U.S. states are already in compliance with Section 303 of the Help America Vote Act of 2002.  Many states have come into compliance by purchasing information technology solutions from the very same vendors from whom the State of Alabama received proposals during the last round of submissions. This indicates that off-the-shelf technology already exists for the implementation and security of single, uniform, official, centralized, interactive computerized statewide voter registration lists.

(Plaintiff's Response at 18).

This is a remarkable statement, made without any submitted foundation.  The plaintiff does not identify any of these states.  The plaintiff does not identify any state that has converted from a number of diverse local computer systems into a

single centralized computer voter list (which is what Alabama will need to

accomplish).[10]

The State has sought to test the validity of the plaintiff's position in two

ways.  First, the State has faxed the chief election officials of each State, requesting

input  (Evidentiary Submission at Exhibit 15, July 14, 2006 memorandum to Chief

Election Officials).  Thus far, only a handful of States have responded, (Evidentiary

Submission at Exhibit 16, responses from Chief Election Officials), and those

responses do not support the plaintiff's position.[11]

---

[10]    Assuming for a moment the truth of this statement, if the plaintiff is right that there exists an off-the-shelf product that Alabama can buy in the same way it buys Microsoft Word, then an RFP is not appropriate at all.  An ITB would instead be needed.  The purchase would be of software and hardware already in existence, not of professional services.  Accordingly, it is imperative that the plaintiff demonstrate the existence of these products so that the Secretary can avoid spending time re-working the original RFP and instead get to work on the exact technical specifications of the products required.

Note that while the Secretary was developing her plan, the undersigned were reviewing the original RFP, meeting with a lawyer in the Finance Department, and speaking with the State Purchasing Director in order to understand whether the RFP process appeared appropriate in this instance and whether there existed any concerns with how the original RFP was handled.  Prior to the Department's suggestion that off-the-shelf products existed, the undersigned had become quite comfortable that an RFP process was appropriate, that a new RFP was desirable, and that only a few concerns remained to be worked through.  Now the plaintiff proposes to push the State back to square one, with an off-the-cuff, unsupported statement suggesting "off-the-shelf" technologies already exist.  If they do, an RFP, as currently contemplated, may not be legally utilized.

[11]    There is a website, electionline.org, which indicates that a number of States are not compliant, that many more have had statewide voter registration systems for years (even decades) before HAVA, and that others developed their own in-house systems.  Assuming that the website is accurate, it does not suitably inform the State about a vendor with an off-the-shelf solution ready to implement.

Second, the State contacted some the vendors who responded to the original

RFP to inquire whether an off-the-shelf system was available.  In a July 17 letter,

SysCon responded that "[t]here is <u>no</u> off the shelf software product on the market

for voter registration on a state wide basis that is just 'plug and play.'"  (Evidentiary

Submission at Exhibit 11, the SysCon letter).   Instead, "[j]ust about any voter

registration software solution available would require some level of customization

by the vendor to meet the specific needs of any given customer or group of

customers."  (*Id.*)

As to the length of time needed to implement the customized statewide voter

registration system, no vendor responded that the task could be accomplished in the

six-month time frame suggested by the plaintiff.  The shortest timeline came in

from SysCon, which said:

> Given the guidelines in the last version of the RFP and without
> substantial deviation, SysCon could team with another organization(s)
> to implement a centralized statewide voter registration solution within
> eight (8) months from contract award.  Based on the latest guidelines
> from the last RFP, a six (6) month implementation schedule is
> unrealistic and would do little to mitigate issues or concerns that will
> arise because an effort of this magnitude is unnecessarily rushed.

(*Id.*).

Election Systems & Software (ES&S) responded that it can meet the

plaintiff's June 2007 deadline, *if the contract is awarded no later than October*

*2006*, and under certain conditions. (Evidentiary Submission at Exhibit 12, ES&S letter dated July 18, 2006). Specifically, ES&S said it "can meet the statewide deployment deadline of June 2007, assuming a contract execution date no later October 2006. This statement also assumes a COTS deployment of the ES&S PowerProfile product, along with standard agency interface requirements." (*Id*).

The only other vendor to respond to the six-month inquiry, Diebold Election Systems, said they "believe that six months to implement a system is not enough time; but the time required to implement a state system is dependent on the requirements of the State." (Evidentiary Submission at Exhibit 13, Diebold letter dated July 18, 2006).

The three other vendors who responded to the State's inquiry have said that they are no longer interested in the project. (Evidentiary Submission at Exhibit 14). One of these vendors, NTS Data Services, LLC, is not interested because the State, and the Court, appear to envision a top down approach, as opposed to a bottom up approach. (*Id.*; see also Tr. 23).

### *The Secretary's Candidacy*

The plaintiff criticizes the HAVA Submission for its inclusion of the facts that the Secretary is herself a candidate in the November 2006 General Election and that potentially a new Secretary may find herself in the midst of this RFP process[12] (HAVA Submission, at 13-14).  The plaintiff contends that the defendants are asserting "the extraordinary proposition that an upcoming election relieves elected officials of their duty to comply with federal law and court orders (Plaintiff's Response at 12).  The defendants are doing no such thing.

Consistent with the Preliminary Injunction's command that the defendants advise the Court of potential problems, (*see* Preliminary Injunction, at 8; *see* HAVA Submission, at 13), the defendants advised the Court that the election is a complicating factor, and it most certainly is.  Since the selection of a HAVA vendor is a decision that a Secretary of State (or her successor) will have to live with for a long time, the election of a new Secretary of State during the vendor selection process could well result in a motion for modification of the selection process or deadlines following the November 2006 General Election.

---

[12]    The Secretary fully intends to remain the Secretary.  She made a strong showing in the primary elections on June 6, 2006.  According to the certified election results available on the Secretary's website, she received 316,043 votes in the Democratic primary.  In contrast Governor Bob Riley received 306,665 votes in the Republican primary, or nearly ten thousand fewer votes.  The Republican candidate for Secretary of State, Beth Chapman, currently State Auditor, did not face a primary challenger.

**The Special Master**

The plaintiff contends that the Court should consider the appointment of a special master "to act under the authority of the Court . . . ." (Plaintiff's Response at 12). The plaintiff further suggests that the Court "should require that the State of Alabama pay the fees and expenses associated with the appointment of the special master." (Plaintiff's Response at 13).

The Secretary is a constitutional officer, Ala. Const. Art. V § 112, and is entrusted by statute as being the State's chief elections officer specifically tasked with HAVA implementation, Ala. Code § 17-4-250(a). As noted in the defendant's HAVA submission, because of her unique position, the Secretary's plan is necessarily the State's plan unless and until the Court decides that the Secretary cannot or will not implement a HAVA plan, or that the Secretary's plan is inadequate and the Secretary cannot or will not commit to a different HAVA plan (Defendants HAVA submission at 1-2, n.1). The Secretary has complied with the Preliminary Injunction to the best of her abilities. The timelines in her plan are the ones she deems necessary and appropriate. The details of the plan (which the plaintiff does not dispute, except for the timeline) are the ones the Secretary deems necessary and appropriate.

27

If this Honorable Court deems that the plan is inadequate, or if this Court finds that it does not have sufficient faith in the ability of the Secretary to implement the plan while simultaneously performing the myriad of other necessary duties of her office (including overseeing the other aspects of November 2006 election process), then appointment of a special master may well be unavoidable: no person should be ordered, upon pain of contempt, to do that which he or she cannot.

Such an appointment, however, cannot be given to a member of the private sector. Because the running of elections is an essential state function which cannot, and should not, be delegated to a private entity, the appointment must be made to a State official. The lengthy proceedings arising out of *Wyatt v. Stickney*, 334 F. Supp. 1341 (M.D. Ala. 1971), are instructive. In the early 1980s, Judge Myron Thompson attempted to appoint a non-state official as receiver of the Department of Mental Health and Mental Retardation (then known by a slightly different name) and the State Defendants obtained a stay of the appointment from the United States Court of Appeals for the Eleventh Circuit. The District Court then appointed an appropriate high State official as receiver. *See Wyatt v. Wallis*, 1986 WL 69194 (M.D. Ala. Sept. 22, 1986) at 2) ("On February 1, 1983, the court appointed a non-state official as receiver. The defendants appealed to, and obtained a stay of the

appointment from, the Eleventh Circuit.  In response to the stay, the court appointed

Ken Wallis, the new governor's legal advisor, as receiver.").

CONCLUSION

Wherefore, for the foregoing reasons, the Defendants respectfully request that

the November 2006 election to proceed as described in the HAVA plan and that the

2008 HAVA compliance plan be approved.

Respectfully submitted,

TROY KING
ATTORNEY GENERAL
BY:

s/Winfield J. Sinclair

Winfield J. Sinclair
Assistant Attorney General
Attorney No. ASB-1750-S81W

s/ Misty S. Fairbanks

Misty S. Fairbanks
Assistant Attorney General
Attorney No. ASB-1813-T71F

Attorneys for Defendants

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 18th day of July, 2006, a copy of the foregoing

has been electronically filed with the Clerk of the Court using the CM/ECF system,

which will electronically send a copy of the same to the following:

> Michael W. Robinson, Esq.
> Alabama Dept. of Public Safety
> Legal Unit
> P.O. Box 1511
> Montgomery, Alabama 36102-1511
>
> Christy A. McCormick, Esq.
> United States Department of Justice
> 1800 G Street, Room 7246
> Washington, D.C. 20006
>
> Robert D. Popper, Esq.
> United States Department of Justice
> 1800 G Street, Room 7270
> Washington, D.C. 20006
>
> Donald Palmer, Esq.
> Civil Rights Division
> Voting Section
> United States Department of Justice
> 950 Pennsylvania Avenue, N.W.
> Room No. 7149
> Washington, D.C. 20006
>
> R. Randolph Neeley, Esq.
> United States Attorney's Office
> P.O. Box 197
> Montgomery, Alabama 36101-0197

Algert Swanson Agricola, Jr., Esq.
Slaten & O'Connor, P.C.
P.O. Box 1110
Montgomery, Alabama 36101-1110

Dorman Walker, Esq.
Balch & Bingham
P.O. Box 78
2 Dexter Avenue
Montgomery, Alabama 36101-0078

Frank Corley Ellis, Jr., Esq.
Wallace, Ellis, Fowler & Head
P.O. Box 587
Columbiana, Alabama 35051

And by first class mail, postage prepaid, to the following:

Wan J. Kim, Esq.
Voting Section
United States Department of Justice
Civil Rights Division
Room 7254-NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

John K. Tanner, Esq.
United States Department of Justice
Chief, Voting Section
Civil Rights Division
Room 7254-NWB
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

s/Winfield J. Sinclair

Winfield J. Sinclair
Assistant Attorney General


Address of Counsel:

Office of the Attorney General
11 South Union
Montgomery, Alabama 36130
TEL: 334-242-7300
FAX: 334-353-8440
E-mail: wsinclair@ago.state.al.us